## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

─────────────────────────────────────────

**DR. FEI WANG**
**Plaintiff**

**v.**

**BOARD OF TRUSTEES OF**
**THE UNIVERSITY OF ILLINOIS,**
**HOWARD GUENTHER,**
**BARBARA WILSON,**
**TIMOTHY L. KILLEEN, and**
**STEVEN BLANKE**
**Defendants**

─────────────────────────────────────────

### COMPLAINT AND JURY DEMAND

COMES NOW Dr. Fei Wang ("Dr. Wang" or "Plaintiff"), and states his Complaint against the Board of Trustees of the University of Illinois ("Board of Trustees"), Howard Guenther ("Guenther"), Barbara Wilson ("Wilson"), Timothy L. Killen ("Killeen"), and Steven Blanke ("Blanke") (collectively "Defendants") as follows:

### THE PARTIES

1.      Dr. Wang is and at all times herein mentioned was, an individual residing in the state of Illinois. Dr. Wang is an Associate Professor of Cell and Developmental Biology in the Department of Cell and Developmental Biology at the University of Illinois at Urbana-Champaign.  Dr. Wang resides in Champaign, Illinois.

2.      Defendant THE BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS (the "BOARD OF TRUSTEES" or "BOT") is an Illinois corporation, commonly referred to as the University of Illinois. The Board of Trustees has a role in the academic termination process. At all times relevant to the actions described in this Complaint, the BOARD OF TRUSTEES was acting under color of law.

3.      At times relevant hereto, Defendant HOWARD GUENTHER was the Research Integrity Officer (RIO) of the University of Illinois at Urbana-Champaign and a resident of Illinois. He facilitated, recommended and approved Dr. Wang's flawed investigation process that has led to his suspension and being subject to dismissal.

4.      At times relevant hereto, Defendant STEVEN BLANKE was the Chair of the Investigation Panel and a resident of Illinois. He facilitated, recommended and approved Dr. Wang's flawed investigation process that has led to his suspension and being subject to dismissal.

5.     At times relevant hereto, Defendant BARBARA WILSON was the Interim Chancellor of the University of Illinois at Urbana-Champaign and a resident of Illinois. She facilitated, recommended and approved Dr. Wang's dismissal under Article X.

6.     At times relevant hereto, Defendant TIMOTHY L. KILLEEN was the President of the University of Illinois at Urbana-Champaign and a resident of Illinois. He recommended and approved Dr. Wang's being subject to dismissal under Article X and referred the charges for dismissal to the BOT..

7.     Each of the individual Defendants listed above, all Board of Trustee members or senior officials at the University of Illinois, is sued in his or her official capacity for equitable and injunctive relief, and monetary damages because the University is not entitled to sovereign immunity. Each of the individual Defendants above is also sued in his or her individual capacity and each acted under color of state law and in the scope of his or her employment while engaging in the actions alleged in this complaint.


## JURISDICTION AND VENUE

8.     At all times set forth herein, Defendants, HOWARD GUENTHER, BARBARA WILSON, THOMAS L. KILLEEN, STEVEN BLANKE, were operating and took action as it relates to Plaintiff's employment with the University of Illinois under color of State law, to-wit: purportedly under the Illinois statutes and regulations and policies governing the operation of the Urbana-Champaign campus of the University of Illinois, a State public university. The jurisdiction of this Court is proper pursuant to 42 U.S.C. § 1983 and 28 U.S.C § 1331 based upon the allegations contained herein that the Plaintiff was deprived of his constitutional rights protected under the Fourteenth Amendment to the United States Constitution and that he was deprived of a valuable property and liberty interest when he was first suspended from teaching and research with the University and employment with the University are being improperly subjected to termination notwithstanding being subjected to a flawed investigatory process related to allegations of research misconduct.

9.     This Court has supplemental jurisdiction over all claims that form part of the same case or controversy pursuant to 28 U.S.C. § 1367.

10.     The Court may exercise personal jurisdiction over Defendants Killeen, Guenther, Wilson and Blanke pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because their place of residence is in the state of Illinois.

11.     The Court may exercise personal jurisdiction over Defendant Board of Trustees pursuant to Federal Rule of Civil Procedure 4(k)(1)(A) because its principal place of business is in the state of Illinois.

12.     The proper venue for this case is the state of Illinois pursuant to 28 U.S. Code § 1391 as Defendants are residents of the state of Illinois and a substantial part of the events or omissions giving rise to the claim occurred in the state of Illinois.


## FACTS

## I. Dr. Wang's Employment with Defendant

13.     Dr. Wang started his employment on November 1, 2005 at Defendant as an Assistant Professor.

14.     From 2005 to 2013, Dr. Wang received annual/biannual performance reviews in which he was rated as exceeding expectations.

15.     Dr. Wang was promoted to Associate Professor with tenure in June 2012.

16.     Dr. Wang's promotion letter also stressed that the University "subscribe[s] to the principles of academic freedom and tenure laid down by the American Association of University Professors (AAUP)," and enclosed a copy of the AAUP's 1940 Statement of Principles on Academic Freedom and Tenure.

17.     Dr. Wang is a highly regarded scientist specializing in the field of stem cell biology.

18.     Dr. Wang's research has made valuable contributions to science in the field of stem cells having published roughly 40 peer-reviewed publications. Dr. Wang also has served as a reviewer on many of the top scientific journals.  Finally, Dr. Wang has delivered over 20 invited lectures at other institutions and national or international meetings.

19.     Dr. Wang enjoyed a stellar reputation in the scientific community before the misconduct proceedings were commenced.

20.     Dr. Wang's professional reputation and career has been irreparably injured as a result of unfair, biased, and factually unsupported misconduct proceedings that are contrary to Defendant's policies and the applicable federal regulations and breaches of required confidentiality.

21.     At all times, Dr. Wang's performance as tenured Associate Professor exceeded a satisfactory level. He never received a negative review about his service as a faculty member at the University of Illinois.

22.     Dr. Wang received an annual salary to compensate him for his research, teaching and service. At all times pertinent hereto, Dr. Wang received 9 months of $87,800 base salary as well as up to three months of salary in the summer when applicable for approximately $9,700 per month.

23.     Dr. Wang was most recently reappointed to his positions as a tenured Associate professor with the University in August 2013.

24.      The rights and responsibilities of Defendant as employer and of Dr. Wang as a tenured professor are set forth in Defendant's University of Illinois Statutes, the Academic Staff Handbook, and other Defendant policies.

25.     As detailed below, Dr. Wang was subjected to research misconduct investigation beginning in March 2014 that resulted in a Final Investigation Report issued in March 2015 that recommended that he be subject to dismissal as a result of its findings.  During the course of the investigation, Dr. Wang was improperly placed on suspension without hearing.

26.     As detailed below, the Investigatory Process accorded Dr. Wang was a sham process facilitated by University defendants who knowingly deviated substantially from the process required under University policy and federal regulations, failed to provide him timely notice of the charges against him, never gave him an adequate opportunity to respond to the charges alleged and ignored substantial evidence that would have cleared Dr. Wang of any charge of research misconduct.

## II.     The University's Research Misconduct Policy Incorporates Federal Regulations That Are Designed Insure an Impartial Fact-finding Process and Fair Adjudication of Allegations of Research Misconduct.

27.     Research Integrity Complaints such as the one alleged brought against Dr. Wang are required to proceed under the University's Policy and Procedures on Integrity in Research and Publications effective August 28, 2009 ("Integrity Policy" or "Policy") (attached hereto as Exhibit 1).

28.     The Integrity Policy declares that it "articulates University of Illinois policy and procedures on integrity in research and publication, and prescribes procedures for impartial fact-finding and fair adjudication of allegations of academic and research Misconduct." (Exhibit 1, page 1)

29.     As stated in the Integrity Policy, "[t]his Policy incorporates federal regulations and guidelines of the U.S. Public Health Service [42 CFR 93 (rev. 2005)]." (Id. page 1).

30.     The Federal Reguations state "Ensuring a fair investigation. Take reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practicable, including participation of persons with appropriate scientific expertise who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the inquiry or investigation." [42 CFR 93 (rev. 2005) (Emphasis added)

31.     The Department of Health and Human Services ("HHS") Office of Research Integrity ("ORI") is responsible for oversight of the use of federal funds in scientific research.

32.     The procedural process mandated by the Integrity Policy includes three stages, "Assessment," "Inquiry" and "Investigation." Exhibit 1 at §V, VI and VII.

33.     In stage one, the Assessment Phase, a "Unit Executive Officer" (UEO) and a "Research Integrity Officer" (RIO) are required to make an initial assessment as to whether the complaint is credible and whether it is sufficiently specific to enable potential evidence supporting the complaint to be identified. The Integrity Policy provides that "the assessment period should be brief, preferably concluded within 15 calendar days." Id. at §V.B.

34.     Unless it is determined that a complaint clearly falls outside the scope of the Policy, the complaint and assessment findings must be brought to the attention of the relevant dean. Id. at §VI.B.

35.     Within 15 days of having a complaint brought to his or her attention, the dean is required to decide whether sufficient evidence exists to warrant moving to the next stage, the Inquiry Phase. Id. at §VI.B.

36. If the dean decides that an inquiry should be conducted, the dean must then appoint an inquiry team comprised of two qualified, unbiased individuals with no potential or actual conflicts of interest in the matter. When feasible, these are to be tenured faculty members, one for the unit in which the conduct in question occurred and the second from elsewhere in the University. The dean may also appoint a third faculty member or academic professional to the team. Id. at §VI.B.

37. The RIO, after consultation with the dean and the UEO, is required to prepare a charge for the inquiry team which (1) sets forth the time for completion of the inquiry; (2) describes the allegations against the Respondent; (3) explains that the purpose of the inquiry is to make an initial review of the evidence and determine whether an investigation is warranted; (4) sets forth the two criteria which must be met in order to warrant an investigation, namely, that (a) there is a reasonable basis to conclude that the complaint falls within the definition of research misconduct and is "within the jurisdictional criteria" of the Policy and (b) that it may have substance; and (5) informs the inquiry team members that they are responsible for preparing or directing the preparation of a written report of the inquiry. Id. at §VI. D.

38. Before the inquiry begins, the RIO is required to make a good faith effort to notify the Respondent, in writing, that the inquiry is being undertaken. Once the inquiry team has been selected, the RIO must send the Respondent a letter setting forth the allegations, including a copy of the Integrity Policy. Id. at §VI.A.

39. Pursuant to the Integrity Policy, the inquiry process should normally involve interviews of the Complainant, the Respondent; and the key witnesses; examination of relevant research records and materials; consultation with experts in the field; and such other steps as may be appropriate. Id. at §VI. D and §VI. H2

40. After evaluating the evidence and then consulting with the RIO, the inquiry team then makes a recommendation as to whether the matter should proceed to stage three, the Investigation Phase. The team must tender its report to the relevant vice chancellor for research (VCR), with a copy to the RIO, within 60 days after the Respondent receive written notice of the inquiry. Id. at §VI. D and §VI. H2.

41. Within 10 calendar days of receiving the inquiry team's report and any written responsive comments from the Respondent, the VCR "***shall determine whether to order an investigation, close the case, or take other appropriate action.***" (Emphasis added)

42. If the VCR decides to order an investigation, the third and final stage in the process, the Respondent must be notified in writing of the allegations to be investigated. The notice must be provided to the Respondent within 30 calendar days after the VCR determines that an investigation is warranted, but before the investigation actually commences. The RIO must also furnish the Respondent with a letter containing a written charge and a list of the Respondent's rights during the investigation process. Id. at §VI. I. (Emphasis added)

43. Within 15 calendar days of notifying the Respondent of the investigation, the VCR, in consultation with the RIO, is required to appoint a three-person investigation panel, "each of whom shall be a tenured faculty member or an academic professional." Id. at §VII. (Emphasis added)

5

44.     After receiving its charge from the VCR, *the panel undertakes its investigation and, within 90 days after its first meeting, presents a written report to the RIO*. The RIO, in turn, submits the report to the VCR, and the VCR transmits the report to the chancellor of the University with any recommendations "for sanctions and/or corrective actions." Id. at §VII. (Emphasis added)

45.     The Integrity Policy further provides that the chancellor makes the final decision regarding disposition of the case. The chancellor "*is the final adjudicator of all allegations of research misconduct subject only to an appeal to the President [of the University] on procedural grounds*." Id. at §VII. (Emphasis added)

46.     The Policy further states that "*Any interim action should be fashioned so as to impose minimal burdens on the Respondent* and others who may be affected, to the extent reasonable and practical, *and to comply with applicable federal laws and regulations, the University Statutes, General Rules and other statutes, rules, policies and regulations applicable to the University*." Id. at §V. B6. (Emphasis added)

47.     Section VII.A of the Integrity Policy further provides that "[t]he RIO shall provide the Respondent with a letter, informing the Respondent of his/her responsibility to appear before the Investigation Panel to present information and respond to the allegations. *The contents of the letter shall include a written charge, including all allegations to be investigated, and a list of the Respondent's rights in the Investigation*, as follows:

1.  *To be notified in writing of any new allegations, not addressed in the Inquiry or in the initial notice of Investigation, within a reasonable time after the determination to pursue those allegations*;
2.  To be interviewed during the Investigation, have the opportunity to correct transcripts of the interview, if made, and have recordings or transcripts, if made, included in the record of the Investigation;
3.  *To have any witness interviewed during the Investigation whom the Panel determines has been reasonable identified by the Respondent as having information on relevant aspects of the Investigation*.
4.  *To submit written statements to the Panel*;
5.  To be accompanied by personal legal counsel or any advisor of choice as set forth in paragraph V.5 of this Policy;
6.  To receive a copy of the draft Investigation Report and, concurrently, a copy of, or supervised access to the evidence on which the draft Report is based, and be notified that any comments to the draft report must be submitted within 30 calendar days of the date on which the draft report was received *and that the comments will be included with the final version of the Report*. (Emphasis added)

48.     Section VII.C. details the appropriate subject matter of the investigation provides:

> The VCR, in consultation with the RIO, *shall set the scope of the Investigation based upon the Complaint and the Inquiry Report (including Respondent's comments)* in a written charge to the

Investigation Panel. ***If during the Investigation, new information comes to light that affects the original charge, amend the scope of the Investigation, or commence a new Investigation***. New information that could substantially change the scope of the Investigation shall be promptly addressed. ***The Respondent shall be informed if the scope of the Investigation changes substantially***.
(Emphasis added)

49. Sections V.C2 and V.C3 subtitled "Sequestration of Records and Evidence" provides that:

> ***Whenever practicable, the Respondent may request and shall upon request be given copies of, or reasonable supervised access to, sequestered research records***.

> ***The RIO shall undertake all reasonable and practical efforts to secure additional research records and evidence discovered during the course of the Research Misconduct proceedings, including at the Inquiry and Investigation stages, or if new allegations arise***. (Emphasis added)

50. Section VII.E subtitled "Proceedings" provides that "The ***Investigation Panel shall interview the Respondent and any witnesses who have been reasonably identified as having relevant information, including witnesses identified by the Respondent. Transcripts of oral interviews, if made, shall be provided to the respective interviewee for corrections and shall be preserved as part of the record of the case***. As necessary, deadline extensions shall be requested from the applicable funding agency." (Emphasis added)

51. Section VII.F-Subtitled "Contents of the Investigation Panel Report" ptovides that ***"Within 90 calendar days after the first meeting, the Panel shall present its written Investigation Report to the RIO***. The RIO shall assist the Investigation Panel to ensure that the Report conforms to the requirements of this Policy. The Report shall:

1. Provide the name and position of the Respondent;

2. Describe the allegations of Research Misconduct subject to the Investigation;

3. Describe the investigative process;

4. Provide a finding with respect to each Complaint as to whether Research Misconduct did or did not occur;

5. Identify and summarize the research records and evidence reviewed, and identify any evidence take into custody but not reviewed; and

6. Provide the names and titles of the Panel members and experts who conducted the Investigation.

52. Section VII.G subtitled "Comments by the Respondent" provides that "Upon receipt of the Investigation Report from the Panel, the RIO shall send a copy of the draft Investigation

Report to the Respondent. *The Respondent may submit written comments to the RIO which must be submitted within 30 calendar days of receipt of the draft Report. Respondent's comments will be shared with the Investigative Panel who shall incorporate them into the Investigation Report*. (Emphasis added)

53.     Section VII.I subtitled "Termination of University Employment" provides that "The termination of Respondent's University employment, by resignation or otherwise, after commencement of the proceedings described herein, shall not cause termination of such proceedings."(Emphasis added)

54.     Section VII.O subtitled "Record Keeping" provides that "Disposition of all records created or gathered under this policy shall be managed consistent with the provisions of the General Rules Concerning University Organization and Procedure (Article VI. Section 4) and the Illinois State Records Act." (Emphasis added)

55.     Section VII.N subtitled "Unfounded Cases" provides that "Bringing unfounded charges motivated by malice constitutes a violation of the purposes and standards for ethical conduct that underlie this document. It shall be a violation of this Policy for any person to bring a charge of Research Misconduct who knows or has reason to know that the charge is unsupported by facts. In cases where no Misconduct is found, all Reports will include a finding whether there was a reasonable basis in fact for making allegations. If at any stage in the proceedings it is determined that the original unfounded allegations or testimony of any person associated with the university was motivated by ill will, that shall be communicated to the Chancellor. The Chancellor may enter a finding of malicious conduct in the person's personnel file or academic record and communicate the finding to the person's UEO. Such a finding may be the basis for disciplinary action or other personnel action in accordance with University rules and policies." (Emphasis added)

56.     Section VII.J subtitled "Appeal" provides that *"The Chancellor is the final adjudicator of all allegations of Research Misconduct that arise at the campus level, subject only to an appeal to the President on procedural grounds.* Appeals on such grounds must be made in writing and filed in the President's Office within 14 calendar days after Respondent receives written notice of the Chancellor's decision. *The sole matter to be raised on appeal shall be whether proceedings conducted in Respondent's case deviated from this Policy to the extent that Respondent was denied due process. The President shall within 30 calendar days either affirm or vacate the Chancellor's decision, and shall notify the appellant and all concerned of this ruling, which shall conclude the proceeding."* (Emphasis added)

57.     Section II.C provides that "All persons involved in proceedings under this Policy shall keep confidential, to the extent reasonably possible, the identities of persons alleging Misconduct ("Complainants") and persons accused of Misconduct ("Respondents"), limiting any disclosure to those who have a need to know and as allowed by applicable law. *Except as may otherwise be prescribed by applicable law, confidentiality must be maintained for any records or evidence from which research subjects may be identified and disclosure of any such records of evidence from which these persons may be identified is limited to those who have a need to know to carry out a Research Misconduct proceeding.*" (Emphasis added)

III.    **Defendant's Investigation Into Research Misconduct Allegations Against Dr. Wang Deprived His Right to Procedural Due Process Due to Numerous Procedural Defects In Violation of Defendant's Integrity Policy, Federal Regulations, and University Statutes Governing Discipline of Tenured Faculty.**

   A.   **Defendant Arbitrarily Bypassed the Inquiry Process In Violation of its Integrity Policy and Federal Regulations.**

58.    In February, 2014, Dr. Jie Chen, Head of the Cell and Developmental Biology Department, received allegations that Dr. Wang engaged in research misconduct with respect to his application for an National Institute of Health ("NIH") Grant submitted in 2011.

59.    Dr. Jie Chen ("Chen"), and RIO Howard Guenther ("Guenther), performed a pre-inquiry assessment of the claims against Dr. Wang and informed him of those allegations in a meeting on March 20, 2014.

60.    At that time, Guenther presented the following four allegations against Dr. Wang related to his application for an National Institute of Health ("NIH") Grant submitted in 2011.

   1.   *A1. 1. Bottom of page 35: statement that "hESCs stably transfected with a DHFR BAC containing the OCT-4, T and PAX6 reporters effectively recapitulate endogenous T and PAX6 expression and trace pluripotency and differentiation activities of hESCs (Fig. 2B and not shown)" is false. The 3-reporter BAC was never constructed. Transfection of BAC into human ES cells (hESCs) never worked. It was confirmed that the 3-reporter BAC clone was never successfully made. Even the 1-reporter BAC was never successfully transfected into hESCs, after tremendous efforts. This project was abandoned before the grant was written. It is also apparent that the images in Figure 2 that Prof. Wang provided must have been from mouse ES cells, not hESCs, based on the distinct morphology.*

   2.   *A2. Page 38: Figure 3F that Prof. Wang submitted shows data from co-immunoprecipitation of endogenous BMPR-IA and BMPR-IB with HA-SGK196, but this experiment was never performed by anyone in the Wang laboratory.*

   3.   *A3. Page 40: There were qPCR experiments performed that were similar to those Prof. Wang described in Figure 5E, but only tried one preliminary experiment for ZIC1 was attempted and did not demonstrate any effect of SGK196 knockdown (black bar compared to white bar), and the effect on SOX1 was not nearly as dramatic as shown in this figure. The experiments described in Figure 5E were*

9

*apparently not performed by anyone in the Wang laboratory.*

4. *A4. Several other statements Prof. Wang provided in the application are false. For instance, on page 37 Prof. Wang states that "we conducted immunoprecipitation of SGK196 from hESC lysates…" Mass spec analysis was only performed with immunoprecipitations from HEK293 cells, not hESCs. BMPR-IA and BMPR-IB were not found this way. On the same page Prof Wang states, "Notably, ubiquilin1 is the predominant isoform in hESCs (data not shown)." No experiment was apparently ever performed to examine different ubiquilin isoforms.*

61.    At that time, Guenther sequestered all the notebooks related to the alleged charges.

62.    On March 21, Guenther emailed Dr. Wang the allegations in a word file entitled "rio.wang.assesement.initial.allegations.summary…" and demanded a response from Dr. Wang by March 31, 2014.

63.    On March 28, 2014 Dr. Wang's wife was informed by her doctor that she would need to have induced labor immediately because of the baby's condition (not growing in weight). This was three weeks earlier than expected due date.

64.    Dr. Wang informed Dr. Chen of the situation. Dr. Chen advised that Dr. Wang could write "something simple".

65.    On March 28, 2014 at approximately 11:00 p.m., during the Assessment Phase, prior to the formation of an independent inquiry team, Dr. Wang prepared a written statement in response to the allegations.

66.    On March 29, 2014, Dr. Wang's son was born.

67.    On April 15, 2014, VCR Peter Schiffer ("Schiffer") ordered a formal Investigation against Dr. Wang without ever conducting an Inquiry.

68.    Schiffer based his decision to initiate an Investigation, without an Inquiry, on alleged admissions made by Dr. Wang in his March 28, 2014 letter.

69.    Specifically, VCR Schiffer relied upon Section V.I.E of the Integrity Policy to initiate an Investigation.  Section V.I.E. specifically provides:

*VI. INQUIRY that if at any time during the proceedings under this Policy, the Respondent provides a written statement of facts and/or admits in writing to the facts alleged in the Complaint that constitute Research Misconduct, the VCR shall decide whether to order an immediate Investigation, in lieu of continuing the Inquiry. If an Investigation is ordered, the Respondent's agreed statement of the facts will serve as the Inquiry Report. Id. at §VI. E. (Emphasis added)*

70.    Section VI.D of Defendant's Policy further provides that "[t]he RIO, after consultation with the Dean(s) and UEO, shall prepare a charge for the Inquiry Team that:

1.  Sets forth the time for completion of the Inquiry;
2.  Describes the allegations and any related issues identified during the Complaint Assessment;
3.  States that the purpose of the Inquiry is to conduct an initial review of the evidence, which may include testimony of the Respondent, Complainant, and key witnesses, and to determine whether an Investigation is warranted;
4.  States that an Investigation is warranted if the Inquiry Team determines: (1) there is a reasonable basis for concluding that the Complaint falls within the definition of Research Misconduct and is within the jurisdictional criteria of this Policy; and (2) the Complaint may have substance, based on the Team's review during the Inquiry.
5.  Informs the Inquiry Team members that they are responsible for preparing, or directing the preparation of, a written report of the Inquiry that meets the requirements of this Policy.

71.    VCR Schiffer did not appoint an inquiry team as mandated by Defendant's Integrity Policy.

72.    Instead, VCR Schiffer bypassed the Inquiry Phase of Dr. Wang's Research Misconduct and immediately advanced the matter to the Investigation Phase without any Inquiry Phase whatsoever.

73.    Notwithstanding a Policy that clearly required Defendant to appoint an Inquiry Team of not less than two independent individuals with necessary expertise to assess the allegations against Dr. Wang, Defendant allowed Guenther and Professor Jie Chen who had previously served as the Assessment Team to rubberstamp their own Assessment to advance the complaint against Dr. Wang to the Investigation Phase without an Inquiry.

74.    Even if Defendant had initiated a formal Inquiry into the complaint against Dr. Wang, Chen and Guenther would not have been eligible to serve as Inquiry Team members because their extensive involvement in handling Dr. Wang's pre-inquiry Assessment Phase precluded them from serving on Dr. Wang's "independent" Inquiry Team.

75.    Moreover, by the plain language of Section VI.D of the Policy, the RIO may not serve as a member of the Inquiry Team. Rather, the RIO's role is limited to defining the scope of the allegations and providing guidance to the Inquiry Team.  Thus, Guenther was not authorized to circumvent the Inquiry and initiate an Investigation pursuant to the exception relied upon by Defendants because no Inquiry had yet begun.

76.    Defendant's decision to order a formal investigation based on Dr. Wang's alleged admissions during the Assessment phase was improper because Defendant had never initiated an Inquiry proceeding as required under the exception detailed in Section VI.E of its Policy.

77.     As a result of Dr. Wang being denied the Inquiry process, he was only given ten days to understand and respond to the initial allegations and examine records related to the preparation of the NIH grant that was prepared more than two and one-half years earlier.

78.     It had taken Dr. Wang more than a half year to formulate and prepare the NIH grant, which consisted of 13 pages of single-space text.. Dr. Wang would need to review several years of work from more than one students to provide a response to the allegations raised at the initial meeting with Guenther and Chen.

79.     If Defendant had conducted a proper Inquiry, Dr. Wang would have been given sufficient time to better understand the initial allegations and to retrieve information and records used for formulating the NIH grant application that was more than two and a half years old and to gather further testimony from third parties to respond to those allegations.

**B. Defendant Failed to Issue a Charge Defining the Scope of the Allegations and Purpose of the Inquiry as Required Under Section VI.D of its Integrity Policy**

80.     Section VI.D of Defendant's Policy requires it to issue a charge for the Inquiry Team defining the time for completion, scope and goals of the Inquiry process.

81.     Defendant failed to initiate the Inquiry process and never issued a formal charge against Dr. Wang.

82.     Instead, Defendant improperly relied on the initial allegations filed with the Department of Cell and Developmental Biology as the basis for pursuing action against Dr. Wang.

**C. Defendant Improperly Expanded the Scope of its Investigation Beyond Dr. Wang's NIH Application Without Providing Dr. Wang Either Proper Notice or the Opportunity to Respond or Defend Against Additional Charges**

83.     Defendant's Integrity Policy required it to conduct its Investigation pursuant to a defined scope with proper notice to Respondent.

84.     Section VII.A of the Integrity Policy specifically provides that "Respondent shall be notified in writing of the allegations to be investigated within 30 calendar days after the determination that an Investigation is warranted, but before the Investigation begins."

85.     Federal Regulations also state "***Notice to the respondent. Notify the respondent in writing of the allegations within a reasonable amount of time after determining that an investigation is warranted, but before the investigation begins. The institution must give the respondent written notice of any new allegations of research misconduct within a reasonable amount of time of deciding to pursue allegations not addressed during the inquiry or in the initial notice of investigation.***" [42CFR 93 (rev. 2005)] (Emphasis added)

86.     On April 29, 2014, Guenther emailed the Investigation Panel which consisted of Blanke, Dr. Newmark and Dr. Gelfand (collectively, "the Panel" or "the Investigation Panel"), outlining four initial allegations related to Dr. Wang's NIH Grant.  In his email to Dr. Wang  on April 29, 2014, he stated that the purpose of the Investigation was to "address the allegations pertaining to

the renewal application submitted by Prof. Wang for grant NIH [2 R01]."  (Attached as Exhibit 2)

87.     After the Investigation Panel's first meeting on April 30, 2014, Guenther sequestered materials related to the Dr. Wang's NIH grant.

88.     Less than one month after the Investigation Panel had been appointed and charged, Guenther subsequently requested additional information from Dr. Wang regarding experiments referenced in a National Science Foundation CAREER grant ("NSF grant") though Dr Wang received no written notice per the University Integrity Policy that the charges against him had been expanded.

89.     On May 13, 2014, Dr. Wang provided a written response ("May Response") to the Investigation Panel about the allegations of the Investigation providing defenses to each alleged act of misconduct related to the NIH grant application.

90.     The Panel did not consider or respond to these comments in either its Draft Report or the Final Report issued in November 2014 and March 2015, respectively.

91.     The Panel and Guenther interviewed Student 3 on June 10, 2014.  This was the first interview of any witness by the Panel during Dr. Wang's investigation.  During that interview, the Panel questioned Student 3 about the NSF grant in which he was working with Dr. Wang. Student 3 had no involvement with Dr. Wang's NIH grant application.

92.     At the beginning of the interview Student 3 was warned that falsifying or withholding information from the Panel would constitute research misconduct.  At the time, Student 3 refuted any claims of misconduct related to the NSF grant or any other misconduct by Dr. Wang during this recorded interview.  This interview was recorded as per the Integrity Policy.

93.     Dr. Wang only became aware of the content of this interview in 2017 during his proceedings before the Committee on Academic Freedom and Tenure ("CAFT") pursuant to the University's Article X tenure revocation proceedings.

94.     Subsequent to this interview, Student 3 purportedly met with Dr. Newmark that same afternoon and claimed that Dr. Wang had committed multiple instances of research misconduct including alleged misconduct related to a manuscript that Student 3 had prepared to be published in the journal *National Chemical Biology*.  This purported interview was not recorded and no record was maintained regarding the meeting.

95.     These same allegations by Student 3 were included in the Panel's Final Investigation Report that was presented to the Chancellor with a recommendation for Dr. Wang's termination.

96.     The full Panel did not interview Student 3 after he changed his testimony to claim research nmisconduct against Dr. Wang notwithstanding his inconsistent statements.

97.     Student 3 made no statements regarding the pending NIH charges against Dr. Wang that day nor could he as he played no role in the NIH research.

98.     That evening, one day before the Panel conducted its only interview of Dr Wang, Dr. Gelfand emailed Guenther, Blanke and Newmark regarding Student 3's changed story and declared (Attached as Exhibit 3)

Colleagues: 1 think if we can get evidences from two members of the Wang lab about data changes and confirm it by examining the manuscripts in question we are basically done. I would consider it

The proof of misconduct

The proof of Fei Wang lying to the committee.

This should be sufficient for U of I administrators to make necessary administrative decisions. It is my (preliminary) opinion at these point that the manuscripts in question should be then recalled, grants returned to the funding organizations and the lab shut down. This can only be accomplished if we take care of the people in the Wang lab who are willing to cooperate with this investigation. Therefore, it would be very important for our successful work if Howard, Jie and U of I administration can provide a path for the cooperating Wang students to successful graduation before we talk to any other students. I believe that the goal of the session tomorrow should be to get Fei Wang on the record denying the allegations (unless he is willing to admit them which seems unlikely), so we can establish a pattern of lying and covering misconduct.

99.     The next day, June 12, 2014, the Panel conducted its only interview of Dr. Wang throughout the course of its investigation.  The interview lasted approximately one hour and was recorded.

100.     The Panel asked Dr. Wang no questions regarding the pending charges against him involving the NIH grant application during the interview.  Rather, the Panel questioned Dr. Wang regarding a NSF grant. Dr. Wang testified that no misconduct had occurred related the NSF grant

101.     Section VII.A of the Integrity Policy further provides that the rights of the Respondent include **"have the opportunity to correct transcripts of the interview, if made, and have recordings or transcripts, if made, included in the record of the Investigation."** (Emphasis added)

102.     Federal Regulations also state *"(g) Interviews. Interview each respondent, complainant, and any other available person who has been reasonably identified as having information regarding any relevant aspects of the investigation, including witnesses identified by the respondent, and record or transcribe each interview, provide the recording or transcript to the interviewee for correction, and include the recording or transcript in the record of the investigation."* [42 CFR 93 (rev. 2005)] (Emphasis added)

103.     Pursuant to the Integrity Policy (VIIO), "*After termination of a case and all ensuing related actions, the RIO shall prepare a complete file, including all research records, evidence reviewed and original records of all research misconduct proceedings, including transcripts or recordings of any interviews if made, and copies of all relevant documents. The RIO shall seal the file and retain it for seven years.*" (Emphasis added)

104.    Contrary to the Federal Regulations and University Policy, Dr. Wang was never given an opportunity to review or address the record of his interview.

105.    On June 23, 2014, Guenther met with Student 1, a student who was involved in the NIH application process.  The Panel was not present for this meeting and no recording or record of the meeting was maintained.

106.    During this meeting, Student 1 allegedly corroborated Student 3's claims of research misconduct.

107.    Pursuant to the Integrity Policy (VII.D), the Investigation Panel is responsible for conducting the investigation and related interviews of any witnesses regarding claims of research misconduct not the RIO Guenther.

108.    Notwithstanding his role versus that of the Panel, Guenther purportedly gathered corroborating witness evidence from Student 1 at this meeting in the Panel's absence that was then subsequently used to allegedly corroborate Student 3's claims of research misconduct in the Panel's Draft and Final Investigation Reports.

109.    On June 24, 2014, Guenther without assistance from the Panel, began preparing the Draft Investigation Report on behalf of the Panel in contravention of Integrity Policy Section VII.F that requires "***the panel undertakes its investigation and, within 90 days after its first meeting, presents a written report to the RIO."***  (Emphasis added)

110.    In his draft, Guenther declared that "the [June 10, 2014] interview and separate discussions with Student 3, as well as subsequent discussions with another graduate student (Student 1) in the Wang lab, revealed a number of additional concerns, which are summarized in Attachment 2.

111.    Attachment 2 in Guenther's Executive Summary specifically states that "Student 1 corroborated **many** of the concerns indicated above by Student 3."

112.    Student 1 could not have corroborated Student 3's accusations because she was not involved in any of Student 3's research.

113.    The executive summary prepared by Guenther, and not the Panel, is nearly identical to the language of the Draft and Final Investigation Report leading to the clear inference that Guenther, not the Panel, prepared the Report and came to his conclusions in June 2014 before the Panel had conducted any additional interviews beyond those with Dr. Wang and Student 3.

114.    Student 1's only interview on the record with the Panel which occurred in September 2014 provides no such corroborative evidence.

115.    Notwithstanding the fact, the Final Investigation Report states more boldly that "Student 1 corroborated **all** of the concerns indicated above" again referncing Student 3's accusations.

116.    At hearing before the CAFT, Blanke testified that Guenther had prepared the Panel's Report notwithstanding plain language in the Integrity Policy that provides that the Panel, not the RIO Guenther, is responsible to draft the Report and its corresponding findings, conclusions and recommendations.

117.    Guenther's preparation of the Inestigation Report is a clear violation of the Integrity Policy's requirement that "***the panel undertakes its investigation and, within 90 days after its first meeting, presents a written report to the RIO.***"  ***Integrity Policy Section VII***. (Emphasis added)

118.    Notwithstanding the Investigation Report's findings declaring that Student 3's accusations had been corroborated, Student 1 did not have any role in either the NSF grant studies or Student 3's *NCB* manuscript.  Similarly, Student 3 had no role in the NIH grant application.  Thus, corroboration was impossible between the Panel's two core witnesses.

119.    At the time this draft was prepared by Guenther on June 24, 2014, notiwithstanding Guenther's conclusions, no other witness other than Student 3 and Dr. Wang had been interviewed by the Panel.

120.    The Panel did not conduct any additional interviews until September 2014 when it conducted brief interviews with Student 1, Student 2 and Faculty 1 and Faculty 2.

121.    During its September interview with Student 1, the Panel did not question her regarding the NIH allegations brought against Dr. Wang notwithstanding the fact that she had been directly involved in the underlying experiments.

122.    During this recorded interview, Student 1 provided none of the corroboration cited by the Panel in its Investigation Report.

123.    The remaining interviews conducted by the Panel in September 2014 did not provide the alleged corroborating evidence cited by the Panel in its Draft or Final Report.

124.    Dr. Wang was not aware of any of these interviews and did not hear the recordings until his CAFT hearing in 2017 and therefore could not use them to respond to the Draft Report.

125.    On November 17, 2014, Guenther sent Dr. Wang an email vaguely referencing "additional allegations" one week prior to Dr. Wang being sent the Investigation Panel's Draft Report summarizing its findings.  (attached as Exhibit 4)

126.    In stark contrast to the very specific allegations of misconduct presented to Dr. Wang in March 2014, Guenther's email only contained one-sentence descriptions of the new allegations and did not provide Dr. Wang any details regarding the precise nature of the additional substantive allegations being investigated.  Guenther's stated in his email:

> In accordance with the Policy, I am providing a summary of additional allegations being pursued by the Panel that were not addressed in the initial notice of the Investigation:  Section B.  The following additional allegations were subsequently added in response to the initial findings by the Investigation Panel and Supplementary Panel:
>
> *B1. Prof. Wang included instances of fabrication and falsification of research results presented in a NSF CAREER grant renewal application (NSF 0953267) for which Prof. Wang is the PI;*

*B2. Prof. Wang included instances of fabrication and falsification of research results by Prof. Wang presented in manuscripts submitted to the journal Nature Chemical Biology for which Prof. Wang was a co-corresponding author;*
*B3. Prof. Wang destroyed original data and research results as a normal practice;*
*B4. Prof. Wang directed students and other personnel in his laboratory to destroy original data with the express purpose of concealing fabrication and falsification of research results;*
*B5. Expenditure abnormalities directed and implemented by Prof. Wang;*
*B6. Prof. Wang provided false and misleading statements in response to the allegations;*
*B7. Prof. Wang violated the terms of his administrative leave.*

127.    On November 21, 2014, Dr. Wang's attorney sent a letter to the University Counsel Laura Clower via both email and mail to request specific details regarding the newly raised allegations. (attached as Exhibit 5)

128.    Neither Clower nor the University ever responded to this request notwithstanding Sections V.C2,3 of the Integrity Policy that requires that "***Whenever practicable, the Respondent may request and shall upon request be given copies of, or reasonable supervised access to, sequestered research records***." (Emphasis added)

129.    By the time the Panel amended its charges to include the claims raised in the November 17, 2014 email and subsequent Draft Report, its investigation had been concluded for two months.

130.    The Draft Report with its additional charges was issued more than 4 months after Dr. Wang had been suspended and denied access to his laboratory and any records that he could use to defend himself against the new charges.

131.    As a result, Dr. Wang was unable to provide additional specific evidence to refute the new charges or to identify additional witnesses to be interviewed by the Panel prior to Defendant's issuance of its Draft Investigation Report. ("Draft Report")

132.    As noted, Sections VII.A, and VII.A.1 of Defendant's Integrity Policy and Federal Regulations required it to inform Dr. Wang of the precise nature of all of the allegations against him in a timely manner.

133.    Section VII.A1 further provides that Defendant must notify Dr. Wang of "***any additional allegations that were not addressed in the initial notice of Investigation within a reasonable time after its determination to pursue those allegations***" (Emphasis added)

134.    Federal Regulations require that the Institution "***Notify the respondent in writing of the allegations within a reasonable amount of time after determining that an investigation is warranted, but before the investigation begins. The institution must give the respondent written notice of any new allegations of research misconduct within a reasonable amount of time of deciding to pursue allegations not addressed during the inquiry or in the initial notice of investigation.***" [42CFR 93 (rev.2005)] (Emphasis added)

135.    Section VII.C of the Policy provides that "[i]f during the Investigation, new information comes to light that affects the scope of the Investigation, the VCR shall determine whether the Panel should continue with its original charge, amend the scope of the Investigation, or commence a new Investigation." (Emphasis added)

136.    ***Section VII.C further requires Respondent "shall be informed if the scope of the Investigation changes substantially***." (Emphasis added)

137.    Notwithstanding Section VII.A of the Integrity Policy specifically requiring that "Respondent shall be notified in writing of the allegations to be investigated within 30 calendar days after the determination that an Investigation is warranted, but before the Investigation begins", Defendant provided only vague notice to Dr. Wang about "additional allegations" months after it began investigating Dr. Wang regarding the vague charges lised in its November 17, 2014 email and just one week before it issued its Draft Investigation Report that found that Dr. Wang had committed misconduct on each of the new allegations.

138.    Notwithstanding specific provision to provide Dr. Wang of notice of additional allegations within a "reasonable time" after its determination to pursue those allegations, Defendant failed to provide Dr. Wang with notice of the additional allegations several months after it began its investigation and into substantial new claims of research misconduct depriving Dr. Wang from presenting witnesses or reports that would have undercut the Panel's finding prior to the issuance of its Draft Report.

139.    Due to the vague nature of additional allegations listed in Genther's November 17, 2014 email, Dr. Wang did not even understand the specifics of the new charges that had been raised against him.

140.    Just eight day later, on November 25, 2014, the Investigation Panel ("Panel") issued its Draft Report including its findings, conclusions and recommendation that Dr. Wang's tenure be revoked.

141.    The Draft Report included the Panel's findings related to the four allegations first raised in March 2014 in Section A as well as its findings related to additional allegations presented to Dr. Wang just a week before.

142.    The additional allegations and findings were detailed in Section B of the Draft Report.

143.    The Draft Report stated that the additional allegations in Section B were "subsequently added in response to the initial findings by the Investigation Panel and Supplementary Panel" in Section B.

144.    Defendant's Draft Report stated that the Panel "also examined an NSF CAREER application for which Prof. Wang was the Principle Investigator ("PI"), in addition to numerous published papers and submitted manuscripts."

145.    This was the first time Dr. Wang was informed of the investigation of the Nature Chemical Biology manuscript.  No notice (written or oral) was ever provided to Dr. Wang about the investigation prior to Guenther's November 17, 2014 email. In fact, no notice was ever provided for investigation of allegations as described in B2 to B7 of the Investigation Report.

146.    This also was the first time Dr. Wang had heard anything regarding new charges B2 to B7.  Although the Panel had questioned Dr. Wang regarding the NSF grant (B1), it had never previously raised formal written charges against him related to the NSF grant.

147.    As a result of receiving notice of new allegations just one week prior to the Panel's issuance of its Draft Report, Dr. Wang was unable to provide any specific evidence to refute or provide contrary evidence or witnesses to refute these additional allegations prior to Defendant's issuance of its Draft Report.

148.    On November 25, 2014, the Investigation Panel ("Panel") issued its Draft Investigation Report ("Draft Report"), a week after the notice of allegations. The Draft Report contains a number of findings of research misconduct against Dr. Wang with respect to the NCB manuscript authored and submitted by Student 3.

149.    The Panel's Draft Report was issued to Dr. Wang well after its Final Report was due to be submitted to RIO Guenther.  Even though the Panel had concluded its final brief interviews by mid-September 2014, it failed present its written report to the RIO within 90 days of its first meeting as required by the Integrity Policy. Id. at §VII.

150.    Dr. Wang subsequently prepared the best response he could to the Draft Report given his lack of access to evidence and witnesses that could have supported his defense.

### D.  The Investigation Panel's Final Report Failed to Consider and Incorporate Dr. Wang's Responses To the Draft Investigation Report Notwithstanding Substantial Defenses Raised Against Each Count of Alleged Misconduct

151.    On January 9, 2015, Dr. Wang submitted a response ("Wang Response") to the Draft Report.

152.    In his submission, Dr. Wang identified numerous procedural and substantive deficiencies in the Draft Report as well as the University's numerous violations of its Integrity Policy and the federal regulations throughout its conduct of the Research Misconduct proceedings.

153.    Notwithstanding his being severely limited in access to information that could exonerate him, Dr. Wang's Response explained in detail why the Panel's findings for each of the allegations of misconduct was erroneous, cited testimony that was inconsistent with and contradicted the conclusions reached by the Investigation Panel, laid out Defendant's numerous violations of the Policy's provisions regarding fairness and the requirement that the investigation be free from biases, and described numerous due process violations. The Response also provided detailed factual statements regarding the new physical evidence and the substantive flaws that should be considered by the Investigation Panel.

154.    Notwithstanding Defendant's Integrity Policy that provides that "the comments (from the Respondent) will be included with the final version of the Report." Id. at § VII (A) and that "Respondent's comments will be shared with the Investigative Panel who shall incorporate them into the Investigation Report." Id. at § VII.G. (Emphasis added).

155.    Notwithstanding Dr. Wang's 79 page Reponses specifically addressing and refuting each charge raised against him in the Draft report, the Final Investigation Report, issued on March 29,

2015 ignored every contradiction and inconsistency identified in Dr. Wang's seventy-nine page Response and was, in fact, identical to the Draft Report, word for word.

156.    The Final Report claimed that "the Panel did not find that any changes to the Investigation Report and supplemental actions were warranted…"

157.    The Final Investigation Report failed to consider Dr. Wang's significant comments and arguments set forth in his January  9, 2015 Response, as is required under the Policy and the applicable Federal Regulations, and was identical to the Draft Investigation Report.

### E.   Defendant Imposed Severe Sanctions on Dr. Wang and Put Him on Administrative Leave Without Notice and Hearing, In Violation of the Integrity Policy and University of Illinois Statutes.

158.    Defendant's Integrity Policy states that "***Any interim action should be fashioned so as to impose minimal burdens on the Respondent and others who may be affected, to the extent reasonable and practical, and to comply with … the University Statutes.***" Exhibit 1 at §V.B6 (Emphasis added)

159.    University of Illinois Statutes (the "Statutes") provide the University with two avenues of action in order to sanction a faculty member for professional misconduct: initiate a proceeding for dismissal for cause under Article X, or initiate a proceeding for the imposition of a severe sanction other than dismissal under Article IX.

160.    Article IX, Section 6b of the Statutes details the procedures for imposing severe sanctions on faculty members other than seeking dismissal for cause.

161.     Section 6b provides specific procedures that must be adhered to for the University to place Dr. Wang on leave of absence.  Section 6b requires at a minimum:(a) A determination by the provost or equivalent campus officer, in consultation with a committee identified by the senate, that cause exists to initiate proceedings that may result in the imposition of serious sanctions; (2) Notice to the faculty member of the charges and initiation of the sanction proceedings; (3) Opportunity for a hearing before an elected committee specified by the senate; (4) Provision that a recommendation by the elected committee against sanction will be final; (5) The opportunity for the faculty member to file an appeal with the chancellor/vice president within 20 days following the provost's or equivalent officer's decision to impose sanctions; (6) An appeal process encompassing both substantive and procedural objections; and (7) A process wherein the chancellor/vice president's decision on the merits of an appeal is final.

162.    None of these steps were followed when the Defendant imposed severe sanctions upon Dr. Wang and put him on "administrative leave."

163.    On July 8, 2014, Guenther sent an email to Dr. Wang to request a meeting on July 9, 2014 without disclosing any information about the nature of the meeting

164.    Without any advanced warnings Dr. Wang's University email account was inactivated on the morning of July 9, 2014, before the meeting took place. That same day, Defendant blocked Dr. Wang's access to his office located at B521, Chemical and Life Science Laboratory (CLSL), the University email, and University-based web accounts.

165.    At the July 9, 2014 meeting, participated by Dr. Chen, Guenther, Dr. Wang and the Director of Academic Human Resources at UIUC – Deborah Stone, Dr. Wang was informed that he would be put on "administrative leave" effective immediately.  At the meeting, Dr. Wang was also provided a letter written by Chen, stating that a full investigation of allegations including but are not limited to instances of significant fabrication and falsification of data and research results was pending. (attached as Exhibit 6)

166.    Dr. Wang was informed that he would not be allowed to be present in his laboratory, office, office building along with many other buildings on campus. Dr. Wang was asked to return all University-issued keys and cards.

167.    Dr. Wang was informed that he would not be allowed to contact students and University employee with regards to the investigation and official University business.

168.    Dr. Wang was also informed that all his grant accounts would be immediately terminated.

169.    After the meeting, Dr. Wang was escorted by Guenther to his office. After collecting personal items of immediate need, Dr. Wang was escorted out of the building.

170.    Upon information and belief, after the meeting was over, Dr. Chen announced to the students and other scientists in Dr. Wang's laboratory that the lab was shutting down immediately and that they would need to find new laboratories.

171.    Since July 8 2014, when Dr. Wang was abruptly put on administrative leave, Dr. Wang has not been able to retrieve or obtain any documents and files from his laboratory, office and web accounts.

172.    Defendant severely limited Dr. Wang's ability to refute the allegations by banning him from access to his office and laboratory, denying him access to all of his UIUC accounts and denying him access to individuals who could provide corroborating evidence in defense to the allegations raised in the Investigation.

173.    By placing Dr. Wang on administratie leave, Defendant not only violated University Statutes regarding leave of absences of tenured faculty, it also violated Section V.B6 of the Intergrity Policy that states that "***Any interim action should be fashioned so as to impose minimal burdens on the Respondent*** and others who may be affected, to the extent reasonable and practical, ***and to comply with applicable federal laws and regulations, the University Statutes, General Rules and other statutes, rules, policies and regulations applicable to the University***." Id. at §V. B6. (Emphasis added)

174.    As a result of being placed on leave of absence, Dr. Wang had no access to those records that he could have used to defend himself both in response to the Investigation Panel's Report and later in a hearing before the Committee on Academic Freedom and Tenure ("CAFT"). Rather than place minimum burdens on Dr. Wang, Defendants made it so Dr. Wang's ability to defend himself was severely impaired.

**IV.    Defendants Killeen and Wilson Denied Dr. Wang's Appeal of the Investigation Panel's Findings Ignoring His Claims of Material Procedural and Substantive Deficiencies Throughout the Investigation Process.**

175. On April 30, 2015, pursuant to the Integrity policy, Dr. Wang appealed to then Chancellor Wise citing the numerous procedural and substantive deficiencies throughout the Investigation Process. (attached as Exhibit 7)

176. On May 18, 2015, Wise denied Dr. Wang's appeal without responding to any of the issues raised by Dr. Wang

177. On May 31, 2015, pursuant to the Integrity policy, Dr. Wang appealed to President Killeen citing the numerous procedural deficiencies throughout the Investigation Process. (attached as Exhibit 8)

178. On June 29, 2015, Killeen responded to Dr. Wang's appeal denying his claims on all counts.

179. On August 27, 2015, following the resignation of Chancellor Wise, Dr. Wang appealed to interim Chancellor Wilson citing the numerous procedural and substantive deficiencies throughout the Investigation Process. (attached as Exhibit 9)

180. On September 10, 2015, University Counsel Laura Clower responded on behalf of Wilson and denied Dr. Wang's appeal. In her letter, Clower stated that "there are no further avenues of reviewes or appeal." (attached as Exhibit 10)


**V.    The Panel's Findings that Dr. Wang Committed Research Misconduct Are Not Supported by the Preponderance of the Evidence**

**A.    Defendant's Investigation Panel Improperly Relied Upon Statements By Two Students Whose Credibility Was Easily Rebutted and Did So Without Providing Dr. Wang With an Opportunity to Refute the Allegations in a Timely Manner**

181. The Panel relied heavily in making its findings on the statements of two of Dr. Wang's graduate students, identified as Student 1 and Student 3 in the Final Report.

182. Student 1 and Student 3 were students who worked in different areas of Dr. Wang's laboratory and provided the Investigation Panel with much anecdotal information that was relied upon the Investigation Panel in making its findings of research misconduct particularly with regard its expanded Investigation.

183. Both students continued to receive funding from the University during the course of Dr. Wang's absence.

184. Both students defended their PhD theses on or about December 2014 during Dr. Wang's absence and were allowed to graduate without lead-author manuscripts published or accepted. Having at least one lead-author manuscript published or at least accepted is a standard policy and prerequisite for graduate students to receive their PhD in the Department of Cell and Developmental Biology.

**1.    The Panel Improperly Relied Upon the Accusations of Student 3 Notwithstanding Clear Evidence That He Had Committed Research Misconduct and Additional Evidence That Student 3 Was Responsible**

**For The Data Submissions That Formed The Basis for The Panel's**
**Finding of Misconduct Against Dr. Wang**

185.     Student 3 joined Dr. Wang's laboratory at the end of 2006. From 2007 to 2014, Student 3 performed research related to applying high-throughput screening ("HTS") to stem cell fate modulation, leading to the identification of two bioactive compounds. The results of these experiments were presented in a manuscript submitted to the NCB journal on April 16, 2014, for which Student 3 was the sole lead author.

186.     Dr. Wang served as co-corresponding author on Student 3's preparation of a publication with *Nature Chemical Biology*.

187.     The University initiate an investigation regarding Dr. Wang's Center for Nutrition, Learning and Memory (CNLM) participated by University of Illinois and Abbott Nutrition.

188.     On April 23, 2014, Guenther sent a formal request to Chancellor Phyllis Wise ("Wise") to issue a variance pursuant to Section V.A.3 of the Policy to request a Supplemental Panel to investigate Dr. Wang's Abbott Laboratories Research.  Dr. Wang was not aware of Guenther's request to Chancellor Wise at the time and learned of it from his attorney on around July 4, 2014, after his attorney spoke with Guenther.

189.      Section V.A.3 permits the Chancellor "after consultation with the RIO and the Respondent … for good cause to extend any timeline or make such other changes to these procedures as may be necessary to effectuate the purposes of this Policy or to insure a Respondent's right to due process."

190.     Wise never consulted Dr. Wang about Guenther's request to convene a Supplemental Panel nor did she notify Dr. Wang in advance of Guenther's request.

191.     Student 3 was also involved in the research supported by Center for Nutrition, Learning and Memory participated by University of Illinois and Abbott Nutrition ("Abbott Grant").

192.     In June 2014, Student 3 was questioned after the Supplemental Abbott Panel was formed to review all CNLM-related experimental work performed in Dr. Wang's laboratory.

193.     Unbeknownst to Dr. Wang, Student 3 admitted to Guenther that he committed research misconduct when he falsified Western blots in a patent disclosure of research supported by CNLM and conducted by Student 3 and another technician.

194.     Dr. Wang was not aware of Student 3's falsifications at the time when the patent disclosure was filed and first learned of them from the Draft Report in November, 2014.

195.     The Draft Report stated that Student 3 admitted to Guenther about the falsifications in June, 2014.

196.     The Investigation Panel relied upon Student 3's claim that Dr. Wang instructed him to hide or destroy data without allowing Dr. Wang to rebut Student 3's allegations prior to issuing its Draft Report.

197.    Notwithstanding Student 3's admitted misconduct, the Investigation Panel relied heavily upon his statements to find that Dr. Wang allegedly had engaged in research misconduct in Student 3's own publications.

198.    The Investigation Panel was aware of the evidence that Student 3 was responsible for preparing, revising, and finalizing the figures appearing in the *Nature Chemical Biology* manuscript when it issued the Final Report in March 2015.  Dr. Wang presented this evidence in his Response to the Draft Report.

199.    During his CAFT hearing, Dr. Wang was able to present evidence that Student 3 prepared the figures and submitted the manuscript to *Nature Chemical Biology* on April 16, 2014 that he later declared to the Panel were evidence of Dr. Wang commiting research misconduct.

200.    Because Dr. Wang was placed on administrative leave in July 2014, he was denied access to documents, witnesses and evidence that he would have used to challenge Student 3's claims that he, and not Student 3, committed the alleged research misconduct claimed by Student 3.

### 2.    The Panel Improperly Claimed Student 1 Corroborated Student 3's Accusations of Misconduct.

201.    The Investigation Panel, or rather Guenther, found that Student 1's statements corroborated Student 3's "research misconduct concerns" on the part of Dr. Wang related to the CNLM research even though Dr. Wang provided evidence that she did not participate in the research described in the CNLM grants and would have lacked independent personal knowledge about the experiments conducted )(Allegation B4).

202.    Similarly, Student 3's claim in the Draft Report that Dr. Wang altered the figures in Student 1's manuscript was contradicted by Student 1's own testimony before the Panel.

203.    In addition, the Panel was aware that Student 3's claims that Dr. Wang intructed people in his laboratory to conceal and destroy data was refuted by Student 1 and Student 2's interviews in September 2014.  These interviews again were not made available to Dr. Wang until his CAFT hearing years after the Investigation had concluded and the Final Report was issued.

204.    The Panel was made aware of these and other contradictory facts in Dr. Wang's Response to the Draft Report and yet the Final Report was identical to the Draft Report.

### VI.    Defendant Released Confidential Information Regarding Its Investigation to Dr. Wang's Collaborators, Other Faculty Members, and the University Community and the Nature Chemical Biology Editorial Office

205.    Shortly after Dr. Wang was sanctioned and put on administrative leave on July 9, 2014, and while Defendant's misconduct proceedings were still ongoing, the Defendant informed Dr. Wang's collaborators and UIUC faculty members who had no involvement in the Investigation about the Misconduct Proceedings and the allegations against Dr. Wang.

206.    Despite its flawed investigatory process that violated University Policy and Federal Regulations, Defendant initiated revocation of Dr. Wang's tenure on September 9, 2015.and continued to circulate the faulty Final Report among the University.

207.    On October 29, 2015, Interim Chancellor Wilson sent an email to members of the University Faculty Advisory Committee (FAC), attaching the Final Investigation Report, without mentioning or inclusion of any of Dr. Wang's previous responses and documents. Dr. Wang protested on November 15, 2015, but was completely ignored.

208.    On information and belief, in around August 2014, Defendant contacted the editorial office of *Nature Chemical Biology* and disclosed information about the Misconduct Proceedings and the allegations against Dr. Wang. Upon hearing about the Proceedings, the Nature Chemical Biology editorial office stated that it would consider a revised manuscript only if Dr. Wang was removed as an author from the manuscript.

209.    Student 3's research led to the identification of two bioactive chemical compounds. One compound – named as displurigen- targets heat shock protein HSPA8, while the other compound –named as mesendogen- enhances mesendoderm differentiation of human stem cells.

210.    On March 24, 2014, the Office of Technology Management (OTM) at UIUC informed Dr. Wang that "OTM believes that there could be commercial value in this [mesendogen] technology and would like to file a coversheet provisional patent application prior to your manuscript submission. Specifically, we would like to market the technology to R+D [R&D] Systems and Stem Cell Technologies by asking them if they would be interested in including this compound in their endoderm/mesoderm differentiation kits."

211.    In the research industry, once a compound is licensed by a large company like R&D Systems and Stem Cell Technologies, they will typically pay an up-front fee and continuing royalty to the inventors, which typically equals approximately 5% of net sales.

212.    The results that described identification of displurigen and mesendogen were presented in the *Nature Chemical Biology* manuscript submitted on April 16, 2014..

213.    On August 21, 2014, after the Defendant contacted the NCB Editorial Office, Guenther wrote to Dr. Wang to request the removal of Dr. Wang's authorship from the NCB manuscript. Dr. Wang refused.

214.    On November 5, 2014, a colleague of Dr. Wang wrote to Dr. Wang, disclosing the "deal" between UIUC and the Nature Chemical Biology Editorial Office and again requesting Dr. Wang to remove his authorship.  Dr. Wang again refused to remove his authorship.

215.    On December 8, 2015, a manuscript that described the screening and the compound displurigen was published in the journal Stem Cell Report. Student 3 is the lead author of the manuscript. Dr. Wang is not an author of the manuscript and was completely unaware of this manuscript prior to its publication.

216.    On December 1, 2015, a manuscript that described the Mesendogen compound was published in the journal Heliyon. Student 3 is the lead and corresponding author of the manuscript. Dr. Wang is not an author of the manuscript and was completely unaware of this manuscript prior to its publication.

**VII.    The CAFT Panel Refused to Consider the Procedural Deficiencies Raised By Dr. Wang**

217.    On September 9, 2015, the University commenced tenure revocation proceedings against Dr. Wang based upon the findings of the Panel's Final Report and the subsequent recommendation by Chancellor Wise.

218.    On October 9, 2015, President Killeen iniated tenure revocation proceedings against Dr. Wang pursuant to Article X of the University Statutes.  (attached as Exhibit 11)

219.    On December 17, 2015, Defendant Wilson, who was asked to oversee the Article X proceeedings by President Killeen, wrote a letter to the Office of the Senate seeking Dr. Wang's dismissal, stating "Professor Wang's misconduct has negatively affected his ability to conduct sponsored research as it is highly probable that Professor Wang will be debarred (perhaps permanently) from eligibility to apply for research funding from federal and granting agencies."

220.    The CAFT chaired by Professor Matthew Finkin held hearings regarding the charges against Dr. Wang between November 2016 and April 2017.

221.    At the commencement of the CAFT proceedings, Dr. Wang, through hs counsel, attempted to address the substantial procedural deficiencies that existed throughout the Univeristy's research misconduct investigation.

222.    The CAFT Panel through Chairman Mathew Finkin made clear to Dr. Wang that the CAFT would not consider any procedural deficiencies that existed in the investigation as part of its deliberations, findings and recommendations.

223.    Notwithstanding Dr. Wang's requests, neither Student 1 nor Student 3 was made available to testify at Dr. Wang's CAFT hearing.

224.    Guenther also was not made available for questioning at Dr. Wang's CAFT hearing.

225.    As a result, all these key witnesses were absent from Dr. Wang's CAFT hearing.

226.    Dr. Wang was allowed access to the files maintained by Guenther but these files were missing substantial evidence used by the Panel in its Report's findings including any evidence of Guenther's unrecorded interviews of Student 1 and Student 3 that were at the core of the findings of research misconduct in the Final Investigation Report.

227.    Guenther's files failed to comply with Integrity Policy provisions (VII.O) requiring him to "*prepare a complete file, including all research records, evidence reviewed and original records of all research misconduct proceedings, including transcripts or recordings of any interviews if made, and copies of all relevant documents*." (Emphais added)

228.    Because Guenther failed to prepare a complete file in accordance with the University's Integrity Policy and Federal Regulations, Dr. Wang was severely impaired in his ability to prepare a defense to the University's charges that tracked the findings of the Final Investigation Report.

229.    On April 5, 2018, the CAFT recommended that Dr. Wang's tenure be revoked.

230.    On May 4, 2018, Defendant Killeen referred charges for tenure revocation to the University of Illinois Board of Trustees ("BOT"). Attached as Exhibit 12

231.    The charges brought before the BOT are identical to the charges heard by the CAFT and flow directly from the findings and recommendation in the Final Investigation Report.

232.    The Board of Trustees subsequently scheduled a hearing on Dr. Wang's tenure revocation for Friday, November 16, 2018 at 9:00 a.m. at the University of Illinois at Chicago.

**COUNT I : 42 U.S.C. § 1983- Procedural Due Process- Property Interests**
*Against all Defendants*

233.    Dr. Wang repeats and re-alleges the allegations contained in paragraphs 1 through 232 above as if set forth fully herein.

234.    By virtue of the parties' contractual agreement, Professor Wang's tenure as an Associate Professor, Plaintiff possessed a property interest in his membership in the University's tenured faculty.

235.    Plaintiff has suffered a deprivation of his property interest as a result of the flawed investigation into the research misconduct complaint.  The flawed investigation has resulted in suspension of Dr. Wang's research and teaching and a finding of research misconduct that subjects Dr. Wang to Article X dismissal proceedings from the University and a loss of his protected property interest as a tenured University professor.

236.    Even more egregiously, as clearly stated in the Wilson's letter to the Office of the Senate seeking Dr. Wang's dismissal, "Professor Wang's misconduct has negatively affected his ability to conduct sponsored research as it is highly probable that Professor Wang will be debarred (perhaps permanently) from eligibility to apply for research funding from federal and granting agencies."  Thus, Defendant's flawed investigation subjects Dr. Wang to suffer substantial harm and stigma to his professional, intellectual and business reputation and him to permanent debarment from funded research, quite literally a death knell to Dr. Wang's chosen career.

237.    Despite Plaintiff's property and liberty interest in his appointment to the University as a tenured faculty member, he was not provided with due process required under the University's Integrity Policy, Statutes, Policies, and Federal Regulations including notice of the charges, an explanation of the evidence against him, an opportunity to tell his side of the story or to present witnesses who could corroborate his defense, or to be heard by an impartial decision maker.  Nor was he provided any notice and hearing for his suspension.

238.    Defendants imposed severe sanctions upon Dr. Wang without due process and in gross violation of its Policy and Statutes.  In so doing, the Defendants acted with actual malice, will to injure, and reckless disregard for the career and rights of Dr. Wang.

239.    Based on the manner in which Plaintiff's teaching and research were suspended, he was denied any hearing or opportunity to challenge that action either before or after it was taken. The University thereby deprived Professor Wang of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

240.    As a direct and proximate result of the University's denial of procedural due process, Professor Wang suffered substantial and irreparable harm, including lost income, the loss of research and teaching, the potential loss of tenured position, out of pocket expenses and severe emotional.

**COUNT II: 42 U.S.C. § 1983- Procedural Due Process- Liberty Interests**
*Against all Defendants*

241.    Dr. Wang repeats and re-alleges the allegations contained in paragraphs 1 through 166 above as if set forth fully herein.

242.    By virtue of the parties' contractual agreement, Professor Wang's tenure as an Associate Professor, Plaintiff possessed a property interest in his membership in the University's tenured faculty.

243.    Plaintiff also suffered a deprivation of his liberty interest as a result of the flawed investigation into the research misconduct complaint.  The flawed investigation has resulted in a finding of research misconduct that subjects Dr. Wang to Article X dismissal proceedings from the University and a loss of his protected property interest as a tenured University professor.

244.    Even more egregiously, as clearly stated in the Final Report, "Professor Wang's misconduct has negatively affected his ability to conduct sponsored research as it is highly probable that Professor Wang will be debarred (perhaps permanently) from eligibility to apply for research funding from federal and granting agencies."  Thus, Defendant's flawed investigation subjects Dr. Wang to suffer substantial harm and stigma to his professional, intellectual and business reputation and him to permanent debarment from funded research, quite literally a death knell to Dr. Wang's chosen career.

245.    Despite Plaintiff's property and liberty interest in his appointment to the University as a tenured faculty member, he was not provided with due process required under the University's Integrity Policy, Statutes, Policies, and Federal Regulations including notice of the charges, an explanation of the evidence against him, an opportunity to tell his side of the story or to present witnesses who could corroborate his defense, or to be heard by an impartial decision maker.  Nor was he provided any notice and hearing for his suspension.

246.    Defendants imposed severe sanctions upon Dr. Wang without due process and in gross violation of its Policy and Statutes.  In so doing, the Defendants acted with actual malice, will to injure, and reckless disregard for the career and rights of Dr. Wang.

247.    Based on the manner in which Plaintiff's research and teaching were suspended, he was denied any hearing or opportunity to challenge that action either before or after it was taken. The University thereby deprived Professor Wang of a property interest and a liberty interest in violation of his rights under the Fourteenth Amendment to the Constitution of the United States.

248.    As a direct and proximate result of the University's denial of procedural due process, Professor Wang suffered substantial and irreparable harm, including lost income, the loss of research and teaching, the potential loss of a tenured position at the University, out of pocket expenses and severe emotional distress.


**COUNT III**
**PRELIMINARY AND PERMANENT INJUNCTION**

249.    The University has repeatedly acted in excess of its delegated authority by violating the fundamental due process rights accorded Dr. Wang as a tenured professor through the University's Rules, Policies, By-laws, Statutes and Regulations during the course of its research

misoconduct investigation and the tenure revocation proceedings which rely upon the findings of the same flawed research misconduct investigation.

250.    There is no internal or administrative procedure provided by the University to force the University to abide by its own Rules, Policies, By-laws, Statutes and Regulations, and its own counsel asserts that the University is beyond reach of the courts.

251.    Dr. Wang has a clearly ascertainable right in need of protection to have the tenure revocation proeedings based upon the flawed research misconduct investigation stopped and the University enjoined from continuing the process against him for all the reasons set forth herein.

252.    In the absence of an Injunction, per Defendant Wilson's own words, Dr. Wang will suffer irreparable harm in the loss of his "ability to conduct sponsored research as it is highly probable that Professor Wang will be debarred (perhaps permanently) from eligibility to apply for research funding from federal and granting agencies."  Thus, Defendant's flawed investigation subjects Dr. Wang to suffer substantial harm and stigma to his professional, intellectual and business reputation and him to permanent debarment from funded research, quite literally a death knell to Dr. Wang's chosen career.

253.    The harm is such a severe nature that Dr. Wang could not be fully compensated by money damages.

254.    Dr. Wang is likely to prevail upon the merits of his case.

255.    The balance of the harm which would incur to Dr. Wang versus the harm to University from an Injunction tips in Dr. Wang's favor.

256.    Public interest favors that the Policies promulgated by a public educational institution which are subject to federal guidelines for research funding and for managing research misconduct invetigations be followed by that educational institution.

257.    Dr. Wang requests that this Court issue an Injunction restraining Defendants from proceeding with its tenure revocation proceedings.

**PRAYER FOR RELIEF**

258.    Because the BOT  and Defendants Killeen,Wilson, Guenther and Blanke acted within the scope of their employment, the Board of Trustees and the State of Illinois are therefore liable as their employer for any resulting damages and award of attorneys' fees.

WHEREFORE, Plaintiff Dr. Fei Wang respectfully requests that the Court enter judgment in his favor and against all Defendants, for preliminary and permanent injunctive and equitable relief including but not limited to reinstatement; and for monetary relief including compensatory damages, punitive damages, and attorneys' fees and costs, and for any other relief that this Court deems just and proper.


just and proper.

**JURY DEMAND**

Plaintiff Dr. Wang hereby demands a trial by jury on issues so triable.

Dated: November 13, 2018

Respectfully submitted,
Stuart D. Polizzi, Attorney at Law
/s/ Stuart D. Polizzi
Stuart D. Polizzi (IL. Bar No. 6278259)
2816 Breckenridge Lane
Naperville, IL. 60565
Tel. (708) 476-6852
*Attorney for Plaintiff Dr. Fei Wang*