**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| DR. FEI WANG <br><br> Plaintiff, <br><br> vs. <br><br> BOARD OF TRUSTEES OF THE UNIVERSITY OF ILLINOIS, HOWARD GUENTHER, BARBARA WILSON, TIMOTHY L. KILLEEN, STEVEN BLANKE, JIE CHEN, TIMOTHY L. KORITZ, and UNKNOWN DEFENDANT(S) <br><br> Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:18-cv-07522 <br> ) Hon. Andrea R. Wood <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**PLAINTFF DR. FEI WANG'S MEMORANDUM OF LAW IN SUPPORT OF HIS
RESPONSE TO
DEFENDANT'S MOTION TODISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

Plaintiff, DR FEI WANG, has brought a five-count Complaint against all of the Defendants. Count I of the Complaint alleges a violation of Plaintiff's Fourteenth Amendment right to due process related to his loss of his property interest by all Defendants. Count II alleges a violation of Plaintiff's Fourteenth Amendment right to due process related to his loss of his liberty interest in employment by all Defendants. Counts III-V are pendent state claim alleging defamation, defamation per se and false light by Defendant Chen and Unknown Defendants. Defendants filed a Motion to Dismiss ("Motion") Plaintiff's Complaint to which Plaintiff now responds.

Defendants' Motion seeks the dismiss Dr. Wang's Complaint on the grounds that the University of Illinois provided him a hearing before the CAFT and then the BOT after it completed a research misconduct investigation. Plaintiff's Complaint has identified numerous deficiencies in the research misconduct "investigation" that directly impact his federal due process rights to: proper notice; an explanation of the evidence against him; his opportunity to tell his story and his right to an unbiased adjudication that has not decided against him in advance. Defendant's Motion fails to

communicate to the Court that Defendants violated federal law (not just state law and University Policy) when it completely abdicated their responsibility to provide Dr. Wang with a full and fair research misconduct investigation to be conducted by an unbiased panel of scientific experts as fully detailed in Plaintiff's First Amended Complaint.

## FACTS

Federal law recognizes that research misconduct investigations are specialized investigations that require under scientific experts to make the determination whether the scientist committed actionable misconduct.

> (f)Ensuring a fair investigation. Take reasonable steps to ensure an impartial and unbiased investigation to the maximum extent practicable, <u>including participation of persons with appropriate scientific expertise</u> who do not have unresolved personal, professional, or financial conflicts of interest with those involved with the inquiry or investigation. 42 CFR 93.310(f) (rev. 2005)(AmC at 34).

University of Illinois Research Policy provides further clarification as to the importance of having scientific experts (and not just any adjudicator) to conduct the investigation requiring the investigation panel to have "sufficient academic training and experiences to understand and judge the allegations of Misconduct" … while also providing that "The Respondent may object to any proposed member of the Panel on the sole ground that the person does not meet the qualifications set forth in paragraph 1 immediately above." (VIIB).  (AmC Exhibit 1)

Current University of Illinois Research Integrity Officer ("RIO") Christopher Lehmann testified at Dr. Wang's Board of Trustee ("BOT") proceeding, that Federal Regulations require the University to provide an annual report to the Office of Research Integrity ("ORI") to assure ORI that the University complies with federal research misconduct guidelines including its obligation to conduct research misconduct investigations that meet federal requirements. See also Section 93.301(a). (AmC at 62).  Plaintiff's Complaint details the numerous severe deficiencies in the investigation that speak directly to federal due process failures.  (AmC at 50). (AmC at 51). (AmC at

53). (AmC at 54). (AmC at 55). (AmC at 56). (AmC at 79-85). (AmC at 88-89). (AmC at 97??). (AmC at 111). (AmC at 116). (AmC at 124). (AmC at 143). (AmC at 148). (AmC at 149-154). (AmC at 165). (AmC at 171-173).  These include: not giving Dr. Wang notice regarding the additional charges brought against him (AmC at 143); bringing ambiguous charges against him without any explanation of the evidence against him and ignoring his pleas to understand the nature of the charges brought (AmC at 141, 143)); placing him on leave of absence without due process and thereby making it impossible for him to fairly and fully defend himself against the charges including the new charges brought in November 2014 (AmC at 196); not maintaining records of the investigation that would allow Dr. Wang to defend himself (AmC at 101, 112, 253); not even interviewing the researchers (including Dr. Wang) directly responsible regarding the claims of research misconduct brought against Dr. Wang under the NIH grant (AmC at 135); and completely ignoring Dr. Wang's response to the draft investigation report in which he identified numerous plain mistakes made by the panel in the report (e.g. AmC 171, Complaint Exhibit 7, Exhibit 9).

Two of the most egregious failings of the investigation panel that impaired Dr. Wang's ability to understand the evidence against him and to tell his side of the story before the investigation panel, the CAFT and the BOT were its failure to even investigate the NIH allegations failure to give Dr. Wang access to the record to defend himself and Guenther's failure to keep records of its investigation, including alleged interviews. (AmC at 197; 253-255). (Both of these failings were in violation of federal law.  [42 CFR 93.305; 42 CFR 93.317 (rev. 2005)] (Emphasis added) (AmC at 109-110). Federal regulators have advised "There are at least two reasons for providing such access: to enable the respondent to prepare a defense against the allegation; and/or to continue the research." [42 CFR 93.305].

The Federal Regulations also require that the investigation be "impartial and unbiased investigation to the maximum extent practicable." [42 CFR 93 (rev. 2005)].  Instead of providing Dr.

Wang with an unbiased panel and report deriving therefrom, Defendant Guenther, who had previously been involved in determining to pursue the investigation against Dr. Wang without the benefit of a detailed inquiry, notwithstanding federal law, served as Dr. Wang's de facto investigator when he wrote the findings and recommendation that Dr. Wang should be terminated while simultaneously fabricating and falsifying findings in the report that Student 1 allegedly corroborated Student 3's claims that Dr. Wang had falsified and fabricated Student 3's research manuscript. (AmC at 117-125). Guenther and the investigation panel were aware that Student 3 had admitted to committing research misconduct. (AmC at 216-217).

As detailed in Plaintiff's Complaint, the panel and Guenther had devised a strategy to determine that Dr. Wang committed research misconduct before they even questioned him. (AmC at 105). They did so based on the word of Student 3, who admitted to have committed research misconduct independent of Dr. Wang and without Dr. Wang's knowledge and who had lied to the panel during his lone interview. (AmC at 99). As Dr. Gelfand stated the panel would be "basically done" the day before the investigation team interviewed Dr. Wang for the only time as part of its investigation and three months before it interviewed any other witness.[1] (AmC at 105). The corroboration Dr. Gelfand believed should terminate the investigation could not have logically been provided when Defendant Guenther drafted the panel's investigation findings and recommendation for them (again in contravention of federal law) and falsified alleged corroboration of purported witnesses in June 2014 **3 MONTHS BEFORE** the panel had interviewed any other witnesses claiming that Student 1 had corroborated "many" of Student 3's numerous accusations of research falsification and fabrication. (AmC at 118-121). The final report incredibly claimed that Student 1 corroborated "all"

---

[1] The University later allowed Student 3 to graduate and publish his manuscript as lead author that he alleged included numerous fabrications and falsifications, while simultaneously forcibly removing Dr. Wang from authorship to further the University's economic interest. (AmC 233-240).

of Student 3's accusations of research misconduct even though the recorded transcript of Student 1's interview provides zero corroborating evidence and no evidence exists or could exist due to the fact that Student 1 had no role in Student 3's research. (AmC at 118-122, 125-129). The report also falsely claimed that Faculty 2 had corroborated other accusations by Student 3. (AmC at 130-131).

When the Panel did interview Dr. Wang and Student 1 in June 2014 and September 2014 respectively, the researchers with direct knowledge of the NIH grant application research in question, they did not ask either a single question about the research that formed the basis of the charges against him, the same charges that formed the basis of his termination by the BOT. (AmC at 106-107, AmC at 134-137). In fact, the investigation panel did not investigate the NIH grant application claims that formed the basis of its creation and the serves as the primary basis for the BOT's decision to terminate Dr. Wang. (AmC at 134-36).

On July 9, 2014, the University placed Dr. Wang on leave of absence and removed his access to his laboratory and all records that he could have used to refute charges against him and forbade him from communicating with anyone from his laboratory. (AmC at 186, 188-190). They did so without notice and without a hearing in violation of University statutes and due process standards. (AmC at 180-184). Defendants' improper action (along with their failure to maintain records of the investigation) action has severely hampered Dr. Wang's ability to have access to evidence that purportedly supports his dismissal and to defend himself to tell his own story and refute the charges against him. (AmC at 194-197).

On November 17, 2014, Guenther sent Dr. Wang a vague email alleging "new charges" against Dr. Wang. (AmC at 140-141). Dr. Wang sought clarification from University counsel Laura Clower regarding the specifics of these new charges. (AmC at 142). His email was ignored. (AmC at 143-144). Eight days later, the panel through Guenther issued its findings that Dr. Wang had committed research misconduct on all charges including the vague charges that he just been emailed

about eight days before for which he had been provided Defendant's records of evidence against him. (AmC at 156). Dr. Wang, without access to the data or witnesses to fully defend himself, and having not been given notice of the new charges against until after he had illegally been placed on leave of absence months before, submitted a response that addressed the procedural deficiencies and obvious substantive mistakes in the panel's report. (AmC at 166-167). Notwithstanding federal law that requires the panel to incorporate Dr. Wang's response into its final report the panel wholly ignored his response and issued a final report that is identical to the draft report. (AmC at 171-173). On April 20, 2015, Dr. Wang appealed to Defendant Killeen citing numerous procedural deficiencies in the investigation but Killen denied his appeal. (AmC at 199-201). On August 27, 2015, Dr. Wang appealed to Defendant Wilson, in her role as the interim Chancellor citing numerous procedural and substantive deficiencies in the investigation but received a simple letter from Laura Clower. (AmC at 202-203).

After gutting Dr. Wang's ability to defend himself during the investigation, Defendant's then proceeded to provide Dr. Wang with purported "due process" its counsel identifies in Defendant's Motion. (AmC at 241-263). First, a CAFT hearing in which Dr Wang remained severely handicapped facing the same vague charges with no access to information to defend himself in part because Defendant Guenther had failed to retain investigation records and interview transcripts as required under federal regulations. (AmC at 255). The CAFT panel simultaneously refused Dr. Wang's demands to have his accusers Student 1, Student 3 and Guenther testify to provide him with an opportunity tell his side of the story. (AmC at 245-247, 250). The CAFT panel also refused to consider any of the numerous egregious procedural deficiencies detailed here and more fully in Dr. Wang's Complaint that had eviscerated his ability to get notice and explanation of the charges against him and to tell his side of the story. (AmC at 245-246). It was before the CAFT (years after the final report as issued) that Dr Wang first gained given access to interview recordings taken by the

investigation panel during its investigation that made clear that Guenther had falsified the final report by claiming corroboration of Student 3's claims of research fabrication and falsification by Student 1. (AmC at 253). The CAFT instead took hearsay testimony from individuals who had no direct involvement in underlying alleged research at issue including Defendant Blanke who issued more than seventy "I don't know" responses when he was questioned about the specifics of the findings of the final report. (AmC at 248, 249). The CAFT committee did not meet the "expertise" qualifications required under federal regulations to determine research misconduct and, thus, could not make for the investigation panel's severely flawed investigation. (AmC at 252).

Defendant's BOT proceeding allowed Dr. Wang twenty minutes to testify regarding the charges (again lacking access to information that was not preserved by the panel in its investigation in violation of federal law) against him and this time presented its case to the Board using witnesses neither of whom played any role in the underlying investigation and hearsay testimony. (AmC at 260). The BOT terminated Dr. Wang based on alleged falsification and fabrications in the NIH grant application and NSF Grant. (AmC at 262, Ex. 13). On December 14, 2018, the BOT issued a press release that stated that "We also find it compelling that, when initially confronted with these allegations, Prof. Wang, according to Prof. Chen, the head of his school, "admitted to everything." (AmC at 263). The press release further stated on page 7, "As another member of the investigation stated: "[I]t was clear that Prof. Wang admitted to having done exactly what he was accused of doing." (AmC at 263). Dr. Wang has never made any admissions that he committed research misconduct. (AmC at 264).

Defendant's bias against Dr. Wang is apparent when it comes to its dealing of Student 3, who admitted to have falsified research results in a patent disclosure without Dr. Wang's knowledge. (AmC at 216, 217). During the CAFT hearing, Dr. Wang was able to present evidence that Student 3 falsified and fabricated the very results he accused Dr. Wang of falsifying and fabricating. (AmC at 222, 223).

Defendant was fully aware of Student 3's misconduct but did not take any actions. Instead, Defendant allowed Student 3 to graduate and publish multiple manuscripts while simultaneously forcibly removing Dr. Wang from authorship. (AmC at 224, 233-240). Student 3's research led to the identification of two bioactive chemical compounds of commercial values. (AmC at 233, 234). By allowing Student 3 to remove Dr. Wang from the authorship, Defendant deprived Dr. Wang of his economic interest. (AmC at 235).

## Motion to Dismiss Standard

For purposes of a motion to dismiss, the court accepts all well-pleaded allegations as true and draws all reasonable inferences in favor of the plaintiff. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1428 (7th Cir. 1996). In ruling on a motion to dismiss for failure to state a claim, the court considers "whether relief is possible under any set of facts that could be established consistent with the allegations." Bartholet v. Reishauer A.G., 953 F.2d 1073, 1078 (7th Cir. 1992). A claim may be dismissed only if it is beyond doubt that under no set of facts would the plaintiff's allegations entitle him to relief. Travel All Over the World, Inc. v. Kingdom of Saudi Arabia, 73 F.3d 1423, 1429-30 (7th Cir. 1996). This doesn't impose a probability requirement on plaintiffs: "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable, and that a recovery is very remote and unlikely." Twombly, 550 U.S. 544, 556 (1955).

## ARGUMENT

**I.      Dr. Wang's Due Process Claims (Counts I and II) are Sufficient as a Matter of law.**

Dr. Wang can establish: (1) that he had a protected property interest; (2) that he suffered a loss of that interest, amounting to a deprivation; and (3) that the deprivation occurred without due process of law. See Moss v. Martin, 473 F.3d 694, 700 (7th Cir.2007). The Seventh Circuit has identified minimum pre-termination procedures that a public employer must follow when seeking to terminate an employee with a constitutionally protected interest in his or her position. Those procedures are: (1) the

provision of oral or written notice of the charges; (2) an explanation of the employer's evidence; (3) an opportunity for the employee to tell his or her side of the story; and (4) the chosen decisionmaker must be impartial. Head v. Chicago Sch. Reform Bd. of Trustees, 225 F.3d 794, 803 (7th Cir. 2000).

Defendants' Motion speaks to the idea of notice, opportunity to defend and hearing but in reality as Plaintiff's Complaint demonstrates, Plaintiff was not afforded a meaningful due process to defend himself against the charges brought against him at the proceeding before the BOT. As a result of a failure to investigate the NIH charges by the investigation panel (which then limited the record before the BOT and Dr Wang's ability to tell his side of the story); a failure to preserve critical evidence (which again limited the record with the same deleterious result), the University's illegal suspension of him that cut him off from access to evidence and witnesses that he could have used to exonerate himself; and failure to notify him of charges related to the NSF grant until after he had been suspended (which again cut off his ability to defend against this charge) (all in violation of federal law and University policy), Dr. Wang was deprived of the opportunity to examine the evidence against him and tell his side of the story to the BOT which relied upon hearsay testimony about the investigation report's findings to terminate Dr. Wang. (AmC at 134-36; AmC at 255; AmC at 180-184, 186, 188-190, 194-197; AmC at 260). The investigation report upon which the BOT relied is the same report that Dr. Wang has identified as having been authored by Guenther, a biased party who falsified findings of research falsification and fabrication against Dr. Wang. (AmC at 258; AmC 118-122; 125-131). The BOT relied upon hearsay witnesses who had no direct involvement in the underlying research while Dr. Wang was forced to attempt to refute charges without the benefit of a record should have been available if Defendants had abided by federal law regarding research misconduct investigations. (AmC at 260). The egregious deficiencies in the investigation are particularly harmful because the CAFT (and the BOT) were not comprised of the type of scientific experts required under federal law to make a determination regarding whether Dr. Wang's actions constituted research

misconduct.

This flawed "procedure" fails to meet due process standards. Levenstein v. Salafsky, 164 F.3d 345, 351 (7th Cir. 1998) ("Levenstein had notice of the charges and understood the evidence against him, but when the procedures used to investigate the charges are a sham through and through, there has not been a constitutionally sufficient opportunity to respond."); See Doe v. Board of Educ. of Oak Park & River Forest High School Dist. 200, 115 F.3d 1273, 1283 (7th Cir.1997); Rao v. Gondi, No. 14 C 66, 2015 WL 9489908, at *2 (N.D. Ill. Dec. 30, 2015)(in the complaint's allegations in favor of Plaintiff. It may turn out to be the case that Plaintiff did have the opportunity to present his side of the story at the two Interviews. But the Court cannot resolve that disputed factual issue on a motion to dismiss). Kasak v. Vill. of Bedford Park, 552 F. Supp. 2d 787, 791–92 (N.D. Ill. 2008) (Plaintiff has sufficiently alleged facts and presented supporting evidence to state such a claim. Plaintiff alleges in the second amended complaint that "the full administrative hearing ... was a sham in that the Board had already made its decision); Joint Anti-Fascist Refugee Comm. v. McGrath, 341 U.S. 123, 180 (1951) (The Loyalty Board convicts on evidence which it cannot even appraise. The critical evidence may be the word of an unknown witness who is 'a paragon of veracity, a knave, or the village idiot.'5 His name, his reputation, his prejudices, his animosities, his trustworthiness are unknown both to the judge and to the accused. The accused has no opportunity to show that the witness lied or was prejudiced or venal. Without knowing who her accusers are she has no way of defending. She has nothing to offer except her own word and the character testimony of her friends.)

Due process requires that, prior to termination, an employee be given the chance to tell her side of the story, and that the agency be willing to listen. Otherwise, the "opportunity to respond" required is no opportunity at all. See Levenstein v. Salafsky, 164 F.3d 345, 352 (7th Cir.1998) (explaining "the commonsense notion that fundamentally biased process is not due process")

Defamation by a public employer coupled with an employee's discharge may work to deprive

an employee of a liberty interest under the Fifth and Fourteenth Amendments. Bone v. City of Lafayette, 763 F.2d 295 (7th Cir.1985). The liberty interest is implicated when either "(1) the individual's good name, reputation, honor or integrity is at stake by such charges as immorality, dishonesty, alcoholism, disloyalty, communism, or subversive acts; or (2) the state imposes a stigma or other disability on the individual which forecloses other opportunities." Mitchell v. Glover, 996 F.2d 164, 167 (7th Cir.1993); See also Elliott v. Hines, 786 F.2d 298, 302 (7th Cir.1986).

Courts have found a deprivation of liberty when the employee was fired for a publicly announced reason that has "impugned his moral character." Lawson v. Sheriff of Tippecanoe County, Indiana, 725 F.2d 1136, 1138 (7th Cir.1984). When the state fires an employee for reasons likely to make him unemployable in the future, he is formally excluded from his occupation and due process must be provided. Paul v. Davis, 424 U.S. 693, 711 (1976). In order to state a cause of action for impairment of his right to liberty of occupation, the plaintiff must show that "(1) he was stigmatized by defendants' conduct, (2) the stigmatizing information was publicly disclosed, and (3) he suffered a tangible loss of other employment opportunities as a result." Paul, 424 U.S. at 701, 96 S.Ct. at 1160–61; Johnson v. Martin, 943 F.2d 15, 16 (7th Cir.1991);

The complaint must show that the dismissal so stigmatized the plaintiff as unfit for employment in a similar job that it deprived him of liberty of occupation. Johnson, 943 F.2d at 16. To meet this requirement, the plaintiff must (1) plead facts that the press release conveyed his identity, Clark, 824 F.2d at 566; (2) show that the statement had a serious damaging effect, Hadley v. County of DuPage, 715 F.2d 1238, 1245 (7th Cir.1983) show that the statement was made with knowledge of its falsity or reckless disregard whether it was false or true, Harte–Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 659, 667 (1989); and (4) show that defendants' statement constituted a fact and not their opinion, Quilici v. Second Amendment Found., 769 F.2d 414, 415 (7th Cir.1985)

Plaintiff's complaint alleges that Defendants' press release untruthfully stated that he had

engaged in improprieties in his research that "according to Prof. Chen, … "he admitted to everything" and that "Prof. Wang admitted to exactly what he was accused of doing" i.e. that he had falsified and fabricated his research.[2] (AmC at 263). Both of these false statements impugn Dr. Wang's reputation as a research scientist where academic honesty is paramount. Dr. Wang has never admitted to commiting research misconduct. (AmC at 264). The University's own charges against Dr. Wang highlight the severity of the damaging effect of these false claims and that it is "<u>highly probable</u>" that he is now unemployable and formally excluded from his occupation as a research scientist where being eligible for granting funding is required to be employable."

> Professor Wang's misconduct has <u>negatively affected his ability to conduct sponsored research</u>, as it is <u>highly probable that Professor Wang will be debarred (perhaps permanently) from eligibility to apply for research funding from federal and other granting agencies</u>. (Wang Complaint Ex. 11, BOT Statement of Charges Allegations in Support of Charges p. 5)(Emphasis added).

a.   **The individual Defendants are not entitled to qualified immunity**

As an initial matter, courts do not ordinarily dismiss a complaint under Rule 12(b)(6) on qualified immunity grounds because entitlement to immunity typically depends on the facts of the particular case. <u>Alvarado v. Litscher,</u> 267 F.3d 648, 651 (7th Cir.2001). In those circumstances in which qualified immunity is assessed pre-trial, courts follow the "Supreme Court's admonition that in determining the immunity issue prior to trial, the facts must be "taken in the light most favorable to the party asserting the injury." <u>Doe v. Board of Trustees of University of Illinois,</u> 429 F.Supp.2d 930, 944 (2006) (citing <u>Saucier v. Katz,</u> 533 U.S. 194, 201 (2001). To be held liable, the individual defendant "must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye." <u>Gentry v. Duckworth</u>, 65 F.3d 555, 561 (7th Cir.1995). Plaintiff's Complaint alleges sufficient facts to bring due process claims against all individual defendants because it adequately pleads that each knew about the

---

[2] Additional defamatory statements exist in the BOT press release including that "According to Professor Chen, she asked him "did you make it up completely" and Prof. Wang answered "Yes." (AmC, Exhibit 13).

University's due process violations, facilitated them, approved them, condoned them, or ignored them in order to wrongfully deprive Plaintiff of his constitutionally protected property interest. The Complaint is replete with specific claims demonstrating exactly that against all named individual Defendants.

In the instant case, Plaintiff has alleged that he had a protected property interest as a tenured professor and that Defendants' denied him due process in taking his property interest through a sham process. Analysis of the applicable constitutional standards and Defendants' unreasonable violations of the same have been detailed by the Seventh Circuit in Levenstein: That takes us to the second part of the immunity inquiry: whether the

> applicable constitutional standards were clearly established at the time in question. Accepting the facts presented in Levenstein's complaint, and the inferences fairly drawn from those facts, we must at this stage resolve that question in Levenstein's favor as well. The pertinent constitutional standards are long-standing, and include those establishing Levenstein's property right in the job, which has been clear at least since Slochower v. Board of Higher Education of City of New York, 350 U.S. 551, 76 S.Ct. 637, 100 L.Ed. 692 (1956), Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), and Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972); those establishing the right to adequate notice and an opportunity to be heard before that job can be taken away, see Roth, 408 U.S. at 573 & n. 12, 92 S.Ct. 2701; see also Loudermill, 470 U.S. at 542-45, 105 S.Ct. 1487; and those clarifying the commonsense notion that fundamentally biased process is not due process. E.g. Palko, supra, 302 U.S. at 327, 58 S.Ct. 149; Fay v. New York, 332 U.S. 261, 288, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Kwock Jan Fat v. White, 253 U.S. 454, 457, 40 S.Ct. 566, 64 L.Ed. 1010 (1920); Ciechon, 686 F.2d at 517. University officials knew that they could not offer only a phony opportunity to contest charges. In their briefs they dispute this characterization of their actions as a matter of fact, but this is not the time for either them or us to engage in that debate. At this stage, therefore, Levenstein has alleged enough to survive dismissal of his procedural due process claims on qualified immunity grounds.

Levenstein v. Salafsky, 164 F.3d 345, 351 (7th Cir. 1998)

Here, Plaintiff has alleged numerous examples of how Defendants process was "sham" in nature. Like the defendants in Levenstein, Defendants knew that a phony process was insufficient for Plaintiff to contest the charges against him. For the foregoing reasons, Plaintiff has sufficiently pled a Fourteenth Amendment violation against Defendants and Defendants' motion to dismiss must be

denied.

### b. Defendant Board of Trustees is not immune from claims seeking prospective equitable relief brought pursuant to 42 U.S.C. § 1983

The Board of Trustees of the University is immune for claims for money damages for the causes of action under §1983. However, the equitable relief sought of reinstatement and continued reappointment thereafter is prospective equitable relief sought by Dr. Wang should be available based upon the allegations and ultimate showing that the Plaintiff's due process rights were violated. Elliott v. Hinds, 786 F.2d 298, 301 (7th Cir. 1986 ("where a suit seeks prospective injunctive relief against a state official for action contrary 'to the supreme authority of the United States', it is not deemed a suit against the sovereign" under the Eleventh Amendment"); Green v. Mansour, 474 U.S. 64, 106 S.Ct. 423, 426, 88 L.Ed.2d 371 (1985) ("Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law.")

## II. Plaintiff's claims for Defamation, and False Light claims (Counts III, IV and V) are sufficiently plead.

Defendant's Motion wholly misses the point with regards to Plaintiff's Defamation, Defamation Per Se and False Light claims. Dr. Wang admitted to having made honest mistakes in stark contrast to the defamatory statements that claim Dr. Wang "admitted to everything" or that "admitted to exactly what he was accused of doing" in the BOT Report which alleged that he falsified his research and fabricated his data. (Compare AmC at 176, to Complaint Ex. 13). There is a vast difference between making honest errors and admitting to have fabricated or falsified research in the occupation of a research scientist. Falsification and fabrication are grounds for committing research misconduct and sanctions including debarment. (Wang Complaint Ex. 11). Committing honest mistakes is not. That blatant difference is obvious when one looks at the federal rules

> Before a researcher can be found to have committed misconduct it must be proven that he acted "intentionally, knowingly, or recklessly." 42 C.F.R. § 93.104(b). (CAFT Plaintiff Exhibit 2J). For this reason, the federal regulations expressly exclude acts of

honest error from the definition of research misconduct. "Research misconduct does not include honest error or differences of opinion." *Id.* § 93.103(d).

To state a claim for defamation, a plaintiff must allege facts that show: (1) the defendant made a false statement about the plaintiff; (2) the defendant made an unprivileged publication of that statement to a third party; and (3) the publication caused her damages. Green v. Rogers, 234 Ill.2d 438, 491 (2009). Where a defendant has made false allegations about an individual's honesty in a profession and impugned his integrity, he is subject to a claim of defamation per se. See Clarage v. Kuzma, 342 Ill.App.3d 573, 581 (3d Dist. 2003). Where, as here, the plead facts are sufficient to substantiate a claim of defamation but are disputed by Defendant's contrary version of the facts, the court must deny Defendant's motion to dismiss based on an affirmative defense of "substantial truth". See Horwitz v. Board of Education of Avoca School District No. 37, 1999 WL 558131WL , *6 (N.D. IL July 21, 1999). Defendant's statements impugn Dr. Wang as having been dishonest in his research, a death knell for a research scientist. As such, Dr. Wang's claims cannot be refuted by a motion to dismiss that claims that the statements were true at this stage of the proceedings (and they are not).

## CONCLUSION

Wherefore, Plaintiff requests this Court to deny Defendants' Motion to Dismiss in its entirety.

Dated: May 15, 2019                                    Respectfully Submitted,

                                                        DR. FEI WANG

                                                        By:    /s/ Stuart D. Polizzi
                                                                His Attorney

Stuart D. Polizzi
THE LAW OFFFICE OF STUART D. POLIZZI, LLC
2816 Breckenridge Lane
Naperville, IL 60565
Tel: (708) 476-6852
Fax: (630) 596-1673
stuartpolizzi@stuartpolizzilaw.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 15th day of May, 2019, I will electronically file the foregoing **PLAINTIFF'S MEMORANDUM OF LAW IN RESPONSE TO DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT** with the Clerk of the Court, using the CM/ECF system and that I will email the same to all Counsel of record at the email addresses identified below:

Christopher B. Wilson
John B. Sample, IV
PERKINS COIE LLP
cwilson@perkinscoie.com
j.sample@perkinscoie.com

                                       /s/ Stuart D. Polizzi _____
                                       His Attorney