# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

FEI WANG, )
)
        Plaintiff, )
)     No. 18-cv-07522
    v. )
)     Judge Andrea R. Wood
BOARD OF TRUSTEES OF THE )
UNIVERSITY OF ILLINOIS, et al., )
)
        Defendants. )

## MEMORANDUM OPINION AND ORDER

Plaintiff Fei Wang was a tenured professor at the University of Illinois at Urbana-Champaign ("University") until his tenure was revoked and he was terminated for committing research misconduct. Wang contends that the proceedings leading to his termination were procedurally deficient and unfair. Consequently, Wang has brought the present action against Defendants Board of Trustees of the University of Illinois ("Board"), Howard Guenther, Barbara Wilson, Timothy L. Killeen, Steven Blanke, Jie Chen, and Timothy L. Koritz.[1] In his First Amended Complaint ("FAC"), Wang asserts two claims under 42 U.S.C. § 1983, alleging that Defendants deprived him of his property interest in his tenured position at the University and his occupational liberty interest in violation of his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, along with state-law defamation and false-light claims. (Dkt. No. 13.) Defendants now move to dismiss the FAC pursuant to Federal

---

[1] Wang has also named "Unknown Defendants," who he describes as persons who made false statements about his alleged admissions regarding research misconduct that led to his dismissal. The Unknown Defendants have not been identified or served with the First Amended Complaint.

Rule of Civil Procedure 12(b)(6). (Dkt. No. 16.) For the reasons that follow, Defendants' motion to dismiss is granted.

## BACKGROUND

For the purposes of the motion to dismiss, the Court accepts all well-pleaded factual allegations in the FAC as true and draws all reasonable inferences in Wang's favor. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007).

Prior to his termination, Wang was a tenured Associate Professor of Cell and Developmental Biology in the Department of Cell and Developmental Biology at the University. (FAC ¶¶ 1, 18, Dkt. No. 13.) In February 2014, Defendant Chen, the Head of the Department of Cell and Developmental Biology, received allegations that Wang had engaged in research misconduct related to a grant application he submitted to the National Institutes of Health ("NIH") in 2011. (*Id.* ¶ 66.) As a result, Chen and Defendant Guenther, the University's Research Integrity Officer ("RIO"), performed a pre-inquiry assessment of the research misconduct claims against Wang. (*Id.* ¶ 67.) On March 20, 2014, Chen and Guenther met with Wang to inform him of the allegations. (*Id.*) The next day, Guenther emailed Wang the allegations and requested a response, which Wang submitted on March 28, 2014. (*Id.* ¶¶ 70, 73.)

Based on Wang's written response, one of the University's Vice-Chancellors for Research ordered a formal investigation. (*Id.* ¶¶ 75–76.) While an inquiry would normally precede an investigation, the Vice-Chancellor for Research determined that the University's Policy and Procedures on Integrity in Research and Publication ("Integrity Policy") allowed the University to forgo an inquiry because allegedly Wang admitted to the facts constituting research misconduct in

his response.[2] (*Id.* ¶¶ 76–77, 80.) A three-person Investigation Panel consisting of Defendant Blanke and two other professors conducted the investigation. (*Id.* ¶ 93.) On April 29, 2014, Guenther emailed Wang to inform him that an investigation had been initiated to address four initial allegations against Wang related to the NIH grant application. (*Id.*) Wang provided the Investigation Panel his written response to those four research misconduct allegations on May 13, 2014. (*Id.* ¶ 96.) On July 9, 2014, without any advance notice and during the pendency of the investigation, Wang was placed on administrative leave, effective immediately. (*Id.* ¶¶ 186–87.) As a condition of his leave, Wang lost access to his University email account and was prohibited from accessing his laboratory, his office, and many other buildings on the University's campus. (*Id.* ¶ 186.) That same day, Wang met with Guenther, Chen, and the University's Director of Academic Human Resources, who asked him to resign. (*Id.* ¶¶ 187, 191.) Wang refused to do so. (*Id.* ¶ 191.)

On November 17, 2014, Guenther sent Wang an email referencing additional allegations against him. (*Id.* ¶¶ 140–41, 153.) The email contained one-sentence descriptions of the new allegations, which related to a National Science Foundation ("NSF") grant-renewal application. (*Id.* ¶ 141.) In response, Wang's counsel promptly sent a letter to the University's counsel seeking more details regarding the new allegations but did not receive a response. (*Id.* ¶ 142.) Eight days after Wang received notice of the new allegations, the Investigation Panel issued its draft investigation report summarizing its findings and conclusions concerning both the NIH grant application allegations and the new NSF grant-renewal application allegations. (*Id.* ¶¶ 156–57.) The draft report recommended that Wang's tenure be revoked. (*Id.* ¶ 156.)

---

[2] The Integrity Policy defines an inquiry as "any preliminary information-gathering and preliminary fact-finding conducted to determine whether an Investigation is warranted." (FAC, Ex. 1 at 2, Dkt. No. 13-1.)

Wang submitted a 79-page response to the draft report on January 9, 2015. (*Id.* ¶¶ 167, 171.) His response raised several procedural and substantive deficiencies in the draft report. (*Id.* ¶ 168.) It also argued that the research misconduct proceedings failed to comply with the Integrity Policy. (*Id.*) Yet the final investigation report issued on March 29, 2015 failed to address any of the issues Wang raised in his response. (*Id.* ¶¶ 171, 173.) Instead, the final report concluded that the Investigation Panel found that no changes to the draft report were warranted. (*Id.* ¶¶ 171–72.)

One month later, Wang appealed the Investigation Panel's findings and recommendation to the University's Chancellor, raising numerous procedural and substantive deficiencies in the investigation process. (*Id.* ¶ 198.) The Chancellor denied Wang's appeal without addressing any of the issues with the investigative process he identified. (*Id.* ¶ 199.) On May 31, 2015, Wang appealed to the University's President, Defendant Killeen, again identifying several deficiencies in the investigation. (*Id.* ¶ 200.) Once again, Wang's appeal was denied. (*Id.* ¶ 201.) Following the resignation of the Chancellor who denied Wang's first appeal, Wang appealed to the new interim-Chancellor, Defendant Wilson, raising the same issues as in his previous appeals. (*Id.* ¶ 202.) That appeal, too, was denied. (*Id.* ¶ 203.)

After the denial of his appeals, the University initiated the process to revoke Wang's tenure based on the findings in the Investigation Panel's final report. (*Id.* ¶¶ 241–42.) The tenure-revocation proceedings were held before the University's Committee on Academic Freedom and Tenure ("CAFT"), which held several hearings on the matter between November 2016 and April 2017. (*Id.* ¶ 244.) Early on in the proceedings, Wang attempted to bring to the CAFT's attention numerous procedural deficiencies in the investigation of the research misconduct allegations, but the CAFT advised him that it would not consider such deficiencies in its deliberations, findings,

and recommendations. (*Id.* ¶¶ 245–46.) Ultimately, on April 5, 2018, the CAFT recommended that Wang's tenure be revoked. (*Id.* ¶ 256.)

As the final step in the revocation process, the matter was referred to Defendant Board—chaired by Defendant Koritz—on May 4, 2018. (*Id.* ¶ 257.) On November 16, 2018, the Board held a hearing on whether to revoke Wang's tenure. (*Id.* ¶ 259.) A month later, the Board decided to terminate Wang and issued a report on its decision. (*Id.* ¶ 262.) The Board's report stated that it found it "compelling that, when initially confronted with these allegations, Prof. Wang, according to Prof. Chen, the head of his school, 'admitted to everything.'" (*Id.* ¶ 263.) In addition, the report also stated that "another member of the investigation stated: 'It was clear that Prof. Wang admitted to having done exactly what he was accused of doing.'" (*Id.*)

## DISCUSSION

To survive a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). This pleading standard does not necessarily require a complaint to contain detailed factual allegations. *Twombly*, 550 U.S. at 555. Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Adams v. City of Indianapolis*, 742 F.3d 720, 728 (7th Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

Wang claims that Defendants violated his rights under the procedural component of the Fourteenth Amendment's Due Process Clause in two ways. First, Wang argues that Defendants' involvement in the procedurally and substantively deficient pre-termination proceedings unconstitutionally deprived him of his property interest in his tenured job at the University.

Second, he contends that those deficient proceedings resulted in the public issuance of a report announcing Wang's termination for research misconduct, which violated his right to occupational liberty by imposing a stigma upon him that now prevents him from pursuing his occupation as a research scientist. Wang also asserts state-law claims against Chen for defamation and false light. Defendants, for their part, contend that the due process claims should be dismissed because Wang received ample process over the four-year period the University spent investigating and reviewing the research misconduct allegations before reaching its decision to terminate him. Defendants further claim that they made no false statement about Wang sufficient to sustain his state-law claims.

## I. Procedural Due Process Claims

### A. Property Interest

Wang first contends that he had a property interest in his tenured position at the University and Defendants deprived him of that interest using a deficient and unfair process. To find a valid procedural due process claim, a court must first "determine whether the plaintiff was deprived of a protected interest" and, if so, it then "must determine what process is due." *Pugel v. Bd. of Trs. of Univ. of Ill.*, 378 F.3d 659, 662 (7th Cir. 2004). There is no dispute that Wang, as a tenured professor at a public university, had a property interest in his job. *Wozniak v. Adesida*, 932 F.3d 1008, 1010 (7th Cir. 2019). Thus, before Wang could be deprived of that interest, he was entitled to "certain limited pre-termination procedures, including, at a minimum: (1) oral or written notice of the charges; (2) an explanation of the employer's evidence; and (3) an opportunity for the employee to tell his . . . side of the story." *Head v. Chi. Sch. Reform Bd. of Trs.*, 225 F.3d 794, 803–04 (7th Cir. 2000). In addition, "the chosen decisionmaker must be impartial." *Id.* at 804. "To require more than this prior to termination would intrude to an unwarranted extent on the

government's interest in quickly removing an unsatisfactory employee." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 546 (1985).

As an initial matter, the Court notes that Wang's FAC sets forth in painstaking detail what he alleges were the University's numerous deviations from the Integrity Policy. But those allegations are largely immaterial to the Court's due process inquiry. *See Wozniak*, 932 F.3d at 1011 ("[The plaintiff] contends that the Committee and Board did not follow all the University's rules and regulations for tenure-revocation proceedings, but this has nothing to do with the Constitution."). "The meaning of the Due Process Clause is a matter of federal law, and a constitutional suit is not a way to enforce state law through the back door. *Id.* Thus, the University simply had to provide constitutionally adequate process; it did not have to adhere strictly to its own internal procedures. *Head*, 225 F.3d at 805 n.10; *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 571 (7th Cir. 2017) ("We have tirelessly reminded litigants that our determination of whether the requirements of *federal* due process were satisfied is different from a determination of whether there was perfect compliance with an institution's rules."); *Ferkel v. Bd. of Educ. of City of Chi.*, 45 F. Supp. 3d 824, 833 (N.D. Ill. 2014).

The Court now turns to whether the University provided constitutionally adequate pre-termination procedures. While Wang does not appear to contend that he received insufficient notice of the research misconduct charges relating to the NIH application grant, he claims that he received insufficient notice that the scope of the investigation had broadened to include allegations concerning the NSF grant-renewal application. Specifically, Wang contends that he was only informed that the investigation encompassed allegations relating to the NSF grant-renewal application just eight days before the Investigation Panel issued its draft report.

"Notice is constitutionally adequate if it is reasonably calculated to apprise interested parties of the proceeding and afford them an opportunity to present their objections." *Head*, 225 F.3d at 804. Here, Wang received notice of the allegations relating to the NSF grant-renewal application during the investigation phase. The notice he received was not insufficient just because it was provided a short time before the Investigation Panel issued its draft report setting forth new charges based on the new allegations. Rather, the draft report was simply that—a draft. After receiving the draft report, which contained a more fulsome explanation of the new allegations, Wang was able to prepare a response with his objections to them. *Cf. id.* (finding that the plaintiff received adequate notice even when the charges were not as specific as he would have liked where the plaintiff "was fully apprised of the charges at the hearing and that afterwards he was able to submit a brief in response to the evidence presented at the hearing"). Indeed, Wang's own allegations contradict his contention that notice was insufficient, as he states that he was able to address and refute each charge raised against him in the draft report. (FAC ¶ 171.)

After receiving Wang's response to the draft investigation report, the University issued its final investigation report. That final report fulfilled the University's obligation to provide an explanation of its evidence. Wang takes issue with the fact that the University did not address any of his objections in its final report. He cites the Integrity Policy to support his claim that the University had an obligation to address explicitly and include his objections to the charges in its final report. (*See* FAC ¶ 170.) But again, as discussed above, just because the University might have deviated from its Integrity Policy does not necessarily mean that Wang did not receive constitutionally adequate process. And Wang cannot point to any case law showing that a public employer insufficiently explains its evidence against a terminated employee when it does not address his objections in response to that evidence. *See Ryan v. Ill. Dep't of Children & Family*

*Servs.*, 185 F.3d 751, 761–62 (7th Cir. 1999) ("At the pre-termination stage . . . the plaintiffs were entitled only to an explanation of the employer's evidence, not a full evidentiary hearing." (internal quotation marks omitted)).

Next, Wang argues that the Investigation Panel's deficient investigation impaired his ability to obtain evidence that would have allowed him to tell his side of the story fully. Specifically, Wang alleges that the RIO, Guenther, failed to maintain a complete record of his investigation, thereby preventing Wang from having full access to certain evidence. Wang also contends that, by suspending him and barring him from his office and laboratory, the University denied him access to documents and files that would have been helpful to his defense. Finally, he claims that the Investigation Panel did not sufficiently investigate the allegations related to the NIH application grant that spurred the investigation.

But Wang's protestations that he was unable to tell his side of the story fully are belied by his own allegations. Indeed, as to his response to the Investigation Panel's draft report, he alleges:

> Notwithstanding his being severely limited in access to information that could exonerate him, Dr. Wang's Response explained in detail why the [Investigation] Panel's findings for each of the allegations of misconduct was erroneous, cited testimony that was inconsistent with and contradicted the conclusions reached by the Investigation Panel, laid out Defendant's numerous violations of the [Integrity] Policy's provisions regarding fairness and the requirement that the investigation be free from biases, and described numerous due process violations. The Response also provided detailed factual statements regarding the new physical evidence and the substantive flaws that should be considered by the Investigation Panel.

(FAC ¶ 169.) Those allegations indicate that Wang was able to overcome his lack of access to information to provide a detailed and comprehensive response to the research misconduct charges. *See Pugel*, 378 F.3d at 665 ("This court is not obligated by [Rule 12(b)(6)'s] standard of review to disregard factual allegations that undermine a plaintiff's claim.").

To the extent there were procedural deficiencies that limited Wang's access to critical evidence, Wang nonetheless acknowledges that he was able to raise the issue (along with his substantive objections) in three different appeals (FAC ¶¶ 198–203), as well as before both the CAFT and the Board (*Id.* ¶ 245; FAC, Ex. 13 at 7–8, Dkt. No. 13-13). Those allegations establish that Wang received "substantial opportunity for hearing that comports with due process." *Pugel*, 378 F.3d at 666 (finding no due process violation where a graduate student dismissed for academic misconduct was able to appeal the decision to the University's president and then received further review from a committee on student discipline). While Wang alleges that the CAFT told him that it would not consider any procedural deficiencies with the investigation (FAC ¶ 246), that is only because the CAFT was reviewing the charges *de novo* and thus would not sit in judgment of the investigative process. (Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. 1 at 34, Dkt. No. 17-1.)[3] Wang further claims that the Board never considered the investigation's procedural defects. That contention, however, is blatantly contradicted by the Board's report, which expressly considers and rejects Wang's procedural objections. (FAC, Ex. 13 at 8–9.) Wang's own allegations show that he availed himself of several opportunities to raise his objections to the Investigation Panel's investigation and report and to explain why he was not guilty of research misconduct.

Moreover, nothing in the Constitution required that Wang be given access to the Investigation Panel's full evidentiary record. Rather, all that is required is that the University explain its evidence. *Ryan*, 185 F.3d at 761 (finding no due process violation where the public

---

[3] Defendants attached as an exhibit to their motion to dismiss the CAFT's report recommending Wang's dismissal due to the research misconduct charges. The FAC makes reference to the report (FAC ¶ 256, FAC, Ex. 13), and because it was a key document leading to Wang's termination, it is considered a part of the complaint and may be considered by the Court in ruling on the motion to dismiss. *Wright v. Assoc. Ins. Cos.*, 29 F.3d 1244, 1248 (7th Cir. 1994).

employer did not provide all documentary support for the charges prior to the pre-termination hearing). It did so in the Investigation Panel's draft and final reports. And Wang does not deny that he had access to most of the relevant evidence underlying the Investigation Report prior to the hearings before the CAFT and the Board. (FAC ¶¶ 113, 227, 253.)

As to the Investigation Panel's failure to investigate the charges related to the NIH application grant, the Board later explained that there was no need to do so "because Prof. Wang admitted to the misconduct at issue." (FAC, Ex. 13 at 9.) Because of those admissions, "there was no need to continue certain aspects of the investigation." (*Id.*) In response to that explanation, Wang states that he "never made any admissions that he committed research misconduct." (FAC ¶ 264.) The Court notes, however, that Wang's denial uses very precise and deliberate language. He does not deny that he engaged in the acts the University found to constitute research misconduct. Indeed, in the FAC, Wang admits to making errors in the NIH grant application that were later identified by the Board as research misconduct. (FAC ¶¶ 176, 178, 179.) Similarly, Wang admitted to the CAFT that there were inaccuracies in the NIH grant application. (Mem. in Supp. of Defs.' Mot. to Dismiss, Ex. 1 at 35.) The FAC and the documents incorporated therein make clear that Wang did have the opportunity to explain his side of the story with respect to the NIH grant application. But in providing that explanation, he admitted to acts that the University believed to constitute research misconduct. Although Wang insists that his actions were merely "honest mistakes" (FAC ¶ 176), "[d]ue process does not require decisionmakers to adopt the charged party's explanation." *Pugel*, 378 F.3d at 666.

Finally, Wang contends that the investigation leading to the revocation of his tenure was biased against him. Specifically, he contends that Guenther, as the RIO, devised a strategy to find Wang culpable of research misconduct at an early point in the investigation. Then, despite not

being a member of the Investigation Panel, Guenther assumed primary responsibility for drafting

the investigation report. Wang's argument is flawed, however, because neither Guenther nor the

Investigation Panel was the decisionmaker. Rather, they conducted an investigation and made a

recommendation that was then referred to the CAFT, which held its own hearings and reviewed

the matter *de novo*. The matter was then referred to the Board, which made the final decision.

Thus, the Board was the decisionmaker and Wang does not allege that the Board had any bias. *See*

*Hess v. Bd. of Trs. of S. Ill. Univ.*, 839 F.3d 668, 677 (7th Cir. 2016) (finding no due process

violation resulting from a student's expulsion, even assuming bias on the part of the officer

presiding over a student's pre-expulsion hearing, because the decision was reviewed by an

unbiased appeals panel).

Even if Guenther's role in the investigation influenced the subsequent proceedings before

the final decisionmaker, Wang fails to allege bias on the part of Guenther sufficient to state a due

process violation. "[T]he constitutional standard for impermissible bias is high." *Piggie v. Cotton*,

342 F.3d 660, 666 (7th Cir. 2003). A plaintiff alleging bias on the part of adjudicators in pre-

termination proceedings "must overcome a presumption of honesty and integrity in those serving

as adjudicators." *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *Head*, 225 F.3d at 804 ("Those

serving as adjudicators are presumed to act in good faith, honestly, and with integrity."). To

overcome this presumption, the plaintiff must allege that the adjudicator had "a pecuniary interest

in the proceeding, personal animosity toward the plaintiff, or actual prejudgment of the plaintiff's

case." *Head*, 225 F.3d at 804 (granting summary judgment to the defendant board of trustees

where the plaintiff did not come forward with sufficient evidence of bias to rebut presumption of

good faith accorded to adjudicators); *see also Calderone v. City of Chicago*, No. 18 C 7866, 2019

WL 4450496, at *6–7 (N.D. Ill. Sept. 17, 2019) (applying presumption at motion to dismiss stage and finding the plaintiff failed to furnish "plausible allegations of bias").

As alleged by Wang, Guenther had prejudged the matter early on in the investigation and then overstepped his role to draft the Investigation Panel's investigation report, which the Board relied upon in reaching its decision to revoke Wang's tenure. Generally, in cases where courts have found that the decisionmaker has prejudged the outcome, the plaintiff was able to show that the decisionmaker had some ulterior motive for seeking to terminate him. For example, in *Levenstein v. Salafsky*, 164 F.3d 345, 348 (7th Cir. 1998), which Wang cites for support, the plaintiff alleged that he was actively pursuing an inquiry about financial irregularities at the medical school that employed him. In *Ciechon v. City of Chicago*, 686 F.2d 511, 516–17 (7th Cir. 1982), the Seventh Circuit granted summary judgment in favor of the plaintiff, a paramedic with an otherwise unblemished record, finding that she was subjected to "undeserved punishment" after a patient in her care died because her employer wished to avoid adverse publicity." And in *Bakalis v. Golembeski*, 35 F.3d 318, 326 (7th Cir. 1994), the Seventh Circuit granted summary judgment to the plaintiff where the evidence showed "the sort of 'running controversy'" between the decisionmaker and the plaintiff "that precluded impartial adjudication." Specifically, the evidence showed that the plaintiff had personally criticized certain members of the community college board of trustees that was making the decision. That criticism resulted in some members of the board of trustees calling for the plaintiff's resignation prior to the pre-termination hearing.

Here, Wang's allegations fail to plausibly plead Guenther or the Investigation Panel's bias. Specifically, he has not alleged that Guenther or any member of the Investigation Panel sought Wang's termination for reasons unrelated to his purported research misconduct or otherwise harbored some animosity toward Wang unrelated to the facts of his case. Nor does Wang allege

that Guenther or anyone else at the University had an ulterior motive to seek disciplinary action against Wang and that research misconduct was simply a pretext.

To indicate Guenther and the Investigation Panel's bias, Wang points to a letter a member of the Investigation Panel sent to Guenther and the other members of the panel early on in the investigation in which he stated his belief that if they could "get evidences from two members of the Wang lab about data changes and confirm it by examining the manuscripts in question we are basically done. I would consider it 1) The proof of misconduct [and] 2) The proof of Fei Wang lying to the committee." (FAC ¶ 105; FAC, Ex. 3, Dkt. No. 13-3.) To Wang, this email demonstrates that Guenther and the Investigation Panel had devised a strategy to find that Wang had committed research misconduct before they had even interviewed him. However, just because in the early stages of an investigation, "decisionmakers tentatively believe the employee should be removed does not raise a constitutional problem—indeed, it would be surprising if the employee were brought up on charges warranting termination absent such belief—so long as the decisionmakers are open to other views." *Ryan*, 185 F.3d at 762. Here, in the email, the member explicitly states that he was only voicing his "(preliminary) opinion." (FAC ¶ 105.) The email, at most, shows that one member of the Investigation Panel believed the panel would be able to adduce sufficient and substantial evidence proving that Wang committed research misconduct. Moreover, Wang's allegations do not support an inference that the member's preliminary belief was a product of impermissible bias or prejudgment, given that Wang had previously submitted an initial response to the research misconduct allegations that had been deemed by a University Vice-Chancellor of Research to constitute an admission.

In any case, nothing in the email supports a plausible inference that Guenther or the Investigation Panel had prejudged Wang's case. Even viewed in the light most favorable to Wang,

the email shows nothing more than the member setting forth a roadmap for proceeding with the investigation and what proof the Investigation Panel would need to uncover to prove the research misconduct charges. Nothing in the email raises an inference that, if the investigation did not proceed according to that plan, the Investigation Panel would have recommended the revocation of Wang's tenure anyway.

Wang also alleges that Guenther's fabrication of corroborating witness testimony shows his bias. However, Wang's claims of fabricated testimony are entirely conclusory. They appear to derive from interviews Guenther conducted with two students who worked with Wang in his laboratory. Wang suggests that the corroborating testimony must have been fabricated because the students did not work on the same research projects. But it is not reasonable to infer that the students could not provide corroborating evidence just because they worked on different research projects. For example, because of the students' close working relationship with Wang, they may have been able to testify generally to certain improper actions or methods Wang employed in his research. Thus, if one student testified that Wang engaged in the same acts on another project that were deemed to constitute research misconduct with respect to the NIH grant application, that testimony could be considered corroborative. That inference is bolstered by the fact that the Investigation Panel's findings ultimately encompassed not just the NIH grant application allegations giving rise to investigation, but other instances of research misconduct such as the allegations relating to the NSF grant-renewal application. Notably, the CAFT report discusses an allegation that Wang had a general practice of directing students to destroy data and the Investigation Panel's evidence in support of the allegation included accounts from two of his students. (Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. 1. at 30–31, 46.)

Finally, even accepting Wang's conclusory allegations of Guenther's and the Investigation Panel's biases as true, the FAC and the documents incorporated therein undermine any inference that their bias tainted subsequent proceedings. *See Bogie v. Rosenberg*, 705 F.3d 603, 609 (7th Cir. 2013) ("When an exhibit incontrovertibly contradicts the allegations in the complaint, the exhibit ordinarily controls, even when considering a motion to dismiss."). In its report, the Board emphasizes that the CAFT's review of the allegations was "a *de novo* process—it does not rely upon the Investigative Process but returns to the beginning." (FAC, Ex. 13 at 9.) Moreover, the CAFT was not even "required to give 'due consideration' to the Investigative Panel." (*Id.*) The CAFT's report itself reinforces the Board's characterization of the process, as it provides a detailed account of its consideration of the evidence and demonstrates that the CAFT fully heard and considered Wang's testimony and objections. (*See generally* Defs.' Mem. in Supp. of Mot. to Dismiss, Ex. 1.) And, at times, the CAFT declines to adopt the Investigation Panel's conclusions and instead finds for certain allegations that the Investigation Panel failed to submit clear and convincing evidence of misconduct. (*E.g.*, *id.* at 53–55.) Such was the case with the allegations concerning Wang's purported practice of destroying data. The CAFT notes the weakness of the students' accounts, states that it would "take a cautious approach to the evidence," and ultimately finds that the evidence established a basis for a research misconduct finding as to that allegation. (*Id.* 46, 54–55)

In sum, Wang's allegations do not support a plausible inference that the University provided him an insufficient hearing before revoking his tenure. To the contrary, the FAC shows that the University undertook a four-year long investigation and review process prior to deciding to revoke Wang's tenure and terminate him. Wang was given ample notice of the research misconduct allegations such that he could prepare a detailed and comprehensive response to them.

And after the Investigation Panel issued its finding and its recommendation that his tenure be revoked, Wang was able to appeal those findings three times. The matter was subject to three levels of review, giving Wang the opportunity to tell his side of the story to the Investigation Panel, the CAFT, and the Board. Only then did an unbiased decisionmaker, the Board, make the final decision to revoke Wang's tenure. Because the Court concludes that these procedures, as alleged in the FAC, were constitutionally adequate, Wang's procedural due process claim is dismissed.

### B.    Liberty Interest

When the Board reached its final decision to revoke Wang's tenure and terminate him, it publicly disseminated a report summarizing its findings and concluding that Wang had committed research misconduct. Wang alleges that Defendants deprived him of his occupational liberty in violation of his Fourteenth Amendment due process rights by engaging in conduct that culminated in the publication of that allegedly false report.

The right to occupational liberty has long been recognized as protected by the Due Process Clause. *Wroblewski v. City of Washburn*, 965 F.2d 452, 455 (7th Cir. 1992) (noting that "[t]he concept of liberty protected by the due process clause has long included occupational liberty—the liberty to follow a trade, profession, or other calling" (internal quotation marks omitted)); *see also Bryant v. Gardner*, 545 F. Supp. 2d 791, 798 (N.D. Ill. 2008). The right to occupational liberty does not include the right to any particular job, however. *Wroblewski*, 965 F.2d at 455; *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 575 (1972) ("It stretches the concept [of occupational liberty] too far to suggest that a person is deprived of 'liberty' when he simply is not rehired in one job but remains free as before to seek another."). Instead, it encompasses the liberty to pursue one's trade, occupation, or calling. *Wroblewski*, 965 F.2d at 455. An individual's

occupational liberty interests are implicated when, in the course of removing someone from an employment position, "the state imposes a stigma or other disability on the individual which forecloses other opportunities." *Townsend v. Vallas*, 256 F.3d 661, 670 (7th Cir. 2001).

Here, Wang contends that publication of the Board's report concluding that he had engaged in research misconduct imposed a stigma on him that foreclosed him from pursuing his occupation as a research scientist. At the pleadings stage, the Court accepts that Wang has sufficiently pleaded that the Board's report accusing him of research misconduct imposed a stigma that prevented him from pursuing future career opportunities as research scientist. Nonetheless, it is not enough that Wang has pleaded the deprivation of a liberty interest. He must also sufficiently allege that the deprivation occurred without due process. *See Doyle v. Camelot Care Ctrs., Inc.*, 305 F.3d 603, 616 (7th Cir. 2002); *see also Chi. United Indus., Ltd. v. City of Chicago*, No. 05 C 5011, 2007 WL 4277431, at *5 (N.D. Ill. Dec. 3, 2007). Indeed, "any cause of action for deprivation of occupational liberty [is] confined to a claim under procedural due process; there is no such cause of action under substantive due process." *Zorzi v. County of Putnam*, 30 F.3d 885, 895 (7th Cir. 1994). As discussed above, Wang's own allegations establish that the University engaged in an extensive, multilevel investigation and review of the research misconduct charges that satisfied the requirements of due process. Thus, Wang has not stated an occupational-liberty procedural due process claim for the same reasons that his property-interest procedural due process claim fails. His occupational liberty claim is thus dismissed as well.

## II.      Defamation and False-Light Claims

In addition to his § 1983 procedural due process claims, Wang also sets forth state-law defamation and false-light claims against Chen. This Court's jurisdiction over those state-law claims was based on the supplemental-jurisdiction statute, 28 U.S.C. § 1367(a), which allows a

federal district court to exercise jurisdiction over all other claims that are so related to the claims within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the Constitution. Having dismissed the § 1983 claims over which the Court had original jurisdiction, it is within this Court's discretion to decline to exercise supplemental jurisdiction over the remaining state-law defamation and false-light claims. *RWJ Mgmt. Co. v. BP Prods. N. Am., Inc.*, 672 F.3d 476, 479 (7th Cir. 2012).

Where a federal district court dismisses all claims under its original jurisdiction before trial, "the presumption is that the court will relinquish federal jurisdiction over any supplemental state-law claims." *Id.* "The presumption is rebuttable, but it should not be lightly abandoned, as it is based on a legitimate and substantial concern with minimizing federal intrusion into areas of purely state law." *Id.* The Seventh Circuit has identified certain circumstances that can rebut the presumption, including:

> (1) the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Id.* at 480. Here, Wang does not make any argument for why this Court should retain jurisdiction over his state-law claims. Nonetheless, the Court believes that the third circumstance applies, as it can quickly conclude that the state-law claims should be dismissed for failure to state a claim.

In Illinois, both defamation claims and false-light claims require the plaintiff to show that the defendant has made a false statement about the plaintiff. *E.g.*, *Solaia Tech., LLC v. Specialty Publ'g Co.*, 852 N.E.2d 825, 839 (Ill. 2006) ("To state a defamation claim, a plaintiff must present facts showing that the defendant made a false statement about the plaintiff, the defendant made an unprivileged publication of that statement to a third party, and that this publication caused

damages."); *Kirchner v. Greene*, 691 N.E.2d 107, 115–16 (Ill. App. Ct. 1998) ("Three elements are required to state a cause of action for false light: (1) the plaintiffs were placed in a false light before the public as a result of the defendants' actions; (2) the false light in which the plaintiffs were placed would be highly offensive to a reasonable person; and (3) the defendants acted with actual malice . . . ."). According to Wang, two false statements were included in the Board's report, one attributed to Chen and the other attributed to an unknown member of the investigation team: (1) "[W]hen initially confronted with [the research misconduct] allegations, Prof. Wang, according to Prof. Chen, the head of his school, 'admitted to everything.'"; and (2) "It was clear that Prof. Wang admitted to having done exactly what he was accused of doing." (FAC ¶ 263.)

As discussed above, Wang's own allegations indicate that those statements were not false. Wang *did* admit to engaging in the actions of which he was accused. Indeed, the Board's report elaborates on what Wang admitted. For example, it states that "he did not perform the research he claimed to have done in the NIH grant application." (FAC, Ex. 13 at 7.) Further, when Wang "was confronted with the fact that he had submitted images of mouse cells and falsely claimed they were images of human cells, Prof. Wang admitted this is exactly what he had done." (*Id.*) The report also directly quotes an email Wang sent to Chen in which he says "I crossed the line by 'guessing' the results and putting error bars on experiments that was [sic] done only once." (*Id.* at 8.) Finally, the report states that Wang told the Investigation Panel that "I deeply regret for the terrible mistakes associated with [the NIH grant]. I wish I could take them back." (*Id.*) Wang does not claim that he did not make any of those statements. Instead, he simply disagrees with the University's characterization of his actions as research misconduct. Thus, because Wang fails to plead a false statement, the defamation and false-light claims are dismissed.

**CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss Wang's amended complaint (Dkt. No. 16) is granted. As it is not plainly impossible for Wang to re-plead one more of the claims to state a viable cause of action, the FAC is dismissed without prejudice. Wang is granted leave to file a second amended complaint that remedies the deficiencies described herein, if he is able to do so, by May 12, 2020.

ENTERED:

Dated:  March 30, 2020

Andrea R. Wood
United States District Judge